IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**08/19/2011**

| | | |
|---|---|---|
| In  re: | § | |
| | § | |
| **BIGLER LP;** | § | **Case No. 09-38188** |
| **BIGLER LAND, LLC;** | § | **Case No. 09-38189** |
| **BIGLER PETROCHEMICAL, LP;** | § | **Case No. 09-38190** |
| **BIGLER PLANT SERVICES, LP;** | § | **Case No. 09-38192** |
| **BIGLER TERMINALS, LP** | § | **Case No. 09-38194** |
| | § | |
| Debtors. | § | **Chapter 11** |
| | § | |
| | § | **JOINTLY ADMINISTERED** |
| | § | **UNDER CASE NO. 09-38188** |
| **AMEGY BANK NATIONAL ASSOCIATION** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 10-03304** |
| | § | |
| **BRAZOS M&E, LTD.,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION ON AMEGY BANK NATIONAL ASSOCIATION'S
ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND TO DETERMINE
EXTENT, VALIDITY AND PRIORITY OF M&M LIENS**
[Adv. Docket No. 1]

## I. INTRODUCTION

This suit concerns three creditors—plaintiff Amegy Bank National Association (Amegy) and two defendants, Shaw Maintenance, Inc. (Shaw) and Halgo Power, Inc. (Halgo)—all of whom were active participants in the main Chapter 11 case and are bound by the plan which was confirmed by this Court. The dispute in this adversary proceeding pertains to the priority of their respective liens. Specifically, Shaw and Halgo request that this Court enter a judgment declaring

1

that they supplied "removables" to the debtors' high purity isobutylene facility (the HPIB Facility) and, therefore, their liens have priority over Amegy's liens. For its part, Amegy, which provided substantial financing to the debtors in the main case, contends that the goods which Halgo and Shaw supplied are not "removables" and, therefore, Amegy's liens are superior to any liens held by Halgo and Shaw.

The trial took place on June 29, 2011, June 30, 2011, July 1, 2011, and July 8, 2011. Seven witnesses testified at the trial, and numerous exhibits were admitted. After closing arguments were made, the Court took the matter under advisement.

The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. STATUS OF THE MAIN CASE

On October 30, 2009, Bigler LP (Bigler), Bigler Land, LLC (Land), Bigler Petrochemical, LP, Bigler Plant Services, LP, and Bigler Terminals, LP (collectively, the Debtors) filed voluntary Chapter 11 petitions. [Finding of Fact No. 4]. The cases were jointly administered under Case No. 09-38188. [Finding of Fact No. 4]. The Debtors owned and operated a petrochemical plant in Pasadena, Texas.

On November 11, 2010, the Debtors filed their Fourth Amended Joint Plan of Liquidation. [Finding of Fact No. 13]. On November 18, 2010, this plan was confirmed, and on November 29, 2010, the plan became effective. [Finding of Fact No. 13]. Since November 29, 2010, the terms of the plan have been—and still are being—effectuated. What primarily remains to be done under the plan is to complete the claims objection process so as to establish which claims will be paid and in what amounts. [Main Case Docket No. 742]. Included in this process is the completion of the adversary proceeding pending before this Court.[1] Indeed, the plan expressly sets forth that, after trial of this adversary proceeding, Amegy will pay Halgo's claim if this Court rules that Halgo's lien on the boilers is superior to the liens that Amegy held on all of the Debtors' assets. Conversely, according to the plan, if Amegy's liens are superior to Halgo's lien, then Halgo will receive nothing. Thus, the plan's treatment of Halgo is an "all or nothing" proposition. The plan treats Shaw in the same manner.

Accordingly, the purpose of this adversary proceeding is to determine which liens have priority, so that a determination can be made as to how much Halgo and Shaw are going to be paid pursuant to the confirmed plan. This Court now issues this Memorandum Opinion to explain its ruling on this dispute.

### III. FINDINGS OF FACT

**A.    The Parties**

1.    Amegy, the plaintiff in this suit, is a banking institution that extended revolving

credit loans and term loans to Bigler and issued letters of credit for the benefit of the

---

[1] Amegy actually initiated this lawsuit prior to confirmation of the plan, and there were initially several defendants in addition to Halgo and Shaw. That is why the style of this suit refers to Brazos M&E Ltd. as opposed to Halgo and Shaw. This suit had not been adjudicated by the date of the plan confirmation hearing, and the plan therefore contemplates that the suit will be tried after confirmation. Meanwhile, since confirmation, Amegy has reached settlements with all of the defendants except Halgo and Shaw. Hence, by the time trial was held, the only remaining defendants were Halgo and Shaw.

Debtors. The Debtors granted to Amegy first priority liens on, and security interests in, substantially all of the Debtors' assets, including the real property and improvements located at 1500 North South Street, Pasadena, Texas 77503.[2] [Adv. Docket No. 156-6, p. 2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

2.  Shaw, one of the defendants in this suit, is a pipe fabrication and installation company that fabricated and installed a process piping system at the HPIB Facility.  [Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

3.  Halgo, another defendant in this suit, furnished boilers and related equipment to the HPIB Facility.  [Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

**B.    Relevant Facts in the Main Case**

4.  The Debtors each filed a voluntary Chapter 11 petition on October 30, 2009 (the Petition Date).  [Main Case Docket No. 1; Adv. Docket No. 156, p. 9; Adv. Docket No. 156-6, p. 2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].  The cases were jointly administered under Case No. 09-38188.  [Main Case Docket No. 31; Adv. Docket No. 156, p. 9; Adv. Docket No. 156-6, p.2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

5.  On March 11, 2010, Halgo filed a secured proof of claim in the amount of $544,918.68 for two boiler units it had supplied to the HPIB Facility.  [Claims Register No. 26; Adv. Docket No. 156, p. 9; Adv. Docket No. 156-6, p. 2; Adv.

---

[2] The real property and improvements located at this particular address constitute the HPIB Facility, which, as noted in the Introduction, refers to the Debtors' high purity isobutylene facility.

Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties]. In the Summary of Claim of Halgo Power, Inc.—which was attached to the Proof of Claim—Halgo stated that it was entitled to recover attorneys' fees under § 38.001 of the Texas Civil Practice & Remedies Code and 11 U.S.C. §§ 502 and 506. [Claims Register No. 26].

6. On May 6, 2010, Shaw filed a secured proof of claim in the amount of $1,447,557.09 for, among other work and materials provided, the process piping system that it supplied and installed at the HPIB Facility. [Claims Register No. 6; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 2; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

7. Halgo and Shaw both filed a Notice of Perfection of Liens in accordance with 11 U.S.C. § 546(b). [Main Case Docket Nos. 261 & 334; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 2-3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

8. On May 11, 2010, the Debtors filed a motion (the Sale Motion) seeking the following relief: (1) approving the bidding and notice procedures related to the sale of substantially all the Debtors' assets; and (2) approving the sale of substantially all the Debtors' assets. [Main Case Docket No. 309; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 2-3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties]. Both Halgo and Shaw filed Objections to the Sale Motion, asserting, among other things, superior liens on "removables." [Main Case Docket Nos. 317 & 336; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties]. The Court

refused to allow Halgo and Shaw to remove the two boilers and piping system, respectively, but rather granted the Sale Motion on May 28, 2010. [Main Case Docket No. 356]. As a result of the Court granting the Sale Motion, the Court ordered that: (1) all of the Debtors' assets—which include the materials provided by Halgo and Shaw—be sold "free and clear of all liens . . . or other interests of any kind or nature whatsoever . . ."; and (2) all liens will attach to the proceeds "with the same validity, force and effect, and in the same order of priority, that such Interests [which includes Halgo's lien and Shaw's lien] had prior to the Sale . . ." [Main Case Docket No. 428]. Moreover, the Court expressly set forth that Halgo and Shaw could credit bid at the auction. Finally, the auction in no way barred Halgo and Shaw from litigating with Amegy to determine whether their respective liens were superior to Amegy's liens. [Main Case Docket No. 356].

9. On May 12, 2010, Amegy filed a secured proof of claim in the amount of $68,483,026.00. [Claims Register No. 58; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

10. Pursuant to the Court's order, an auction was conducted on June 16, 2010, to sell substantially all of the Debtors' assets. [Main Case Docket No. 405; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

11. Bigler accepted Amegy's credit bid of $38,000,000.00 for the HPIB Facility. [Main Case Docket No. 405; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

6

Following the June 16, 2010 auction, Amegy assigned its winning bid for the HPIB Facility to Enterprise Products (Enterprise).   [Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

12. The sale to Enterprise closed on November 18, 2010, and Enterprise now operates the HPIB Facility.  [Adv. Docket No. 156, p. 10-11; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].  Amegy's claim was not fully satisfied from the proceeds of the sale of the HPIB Facility; after the sale, Amegy was still owed approximately $30,000,000.  [Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

13. On November 11, 2010, the Debtors filed their Fourth Amended Joint Plan of Liquidation (the Plan).  [Main Case Docket No. 642; Adv. Docket No. 156, p. 10; Adv. Docket No. 156-6, p. 3; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].  On November 18, 2010, the Plan was confirmed, and on November 29, 2010, the Plan became effective.  [Main Case Docket Nos. 659 & 677; Adv. Docket No. 156, p. 11; Adv. Docket No. 156-6, p. 3-4; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].  Article 14.16 of the Plan provides, in pertinent part, that Texas law governs "[u]nless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or by the general corporation law, limited partnership law or limited liability company law or the law of the jurisdiction of organization of any entity governing the internal affairs of such entity." [Main Case Docket No. 642].

14. Article 3.3 of the Plan provides, in pertinent part, for the treatment of Halgo and Shaw's claims such that if the claims should be determined to be superior to Amegy's liens, then: "[E]ach holder of an Allowed Removables Claim shall receive . . . payment in Cash by Amegy equal to the value of the Collateral securing its Lien, as determined by the Bankruptcy Court in [the] M&M Lien Priority Adversary . . . ." [Main Case Docket No. 642; Adv. Docket No. 156, p. 11; Adv. Docket No. 156-6, p. 4; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

15. Article 1.1.74 of the Plan defines the "M&M Lien Priority Adversary" as "the adversary proceeding styled *Amegy Bank National Association v. Brazos M&E, Ltd, et al.*, pending in the Bankruptcy Court under Adv. Pro. No. 10-03304."[3] [Main Case Docket No. 642].

16. Article 1.1.31 of the Plan defines "Collateral" to be "any property or interest in property of a Debtor's Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code . . . ." [Main Case Docket No. 575].

17. Article 1.1.102 of the Plan defines "Removables Claim" to be "any mechanic's and materialmen's lien claim that is a Secured Claim which is determined by Final Order to be superior to the Pre-Petition Lender [i.e., Amegy] Secured Claim pursuant to the M&M Lien Priority Adversary." [Main Case Docket No. 575; Adv. Docket No. 156, p. 11; Adv. Docket No. 156-6, p. 4; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties]. Thus, the effect of Articles 3.3, 1.1.31, and 1.1.102 of the Plan is that if this Court holds that Halgo's lien is valid and superior to Amegy's liens, then Amegy must pay cash to Halgo in the amount of the value of Halgo's

---

[3] *See* Footnote No. 1.

collateral. The same result applies if this Court holds that Shaw's lien is valid and superior to Amegy's liens. Conversely, if this Court holds that Amegy's liens are superior to Halgo and Shaw's liens, then Amegy owes nothing to Halgo and Shaw; and, pursuant to the Plan, Halgo and Shaw receive nothing.[4]

**C.    Amegy's Liens That Were Granted Pre-Petition**

18. On May 18, 2007, Bigler entered into a loan agreement with Amegy (the Pre-Petition Loan Agreement). On April 17, 2008, Bigler entered into an Amended and Restated Credit Agreement with Amegy (the Pre-Petition Credit Agreement). [Adv. Docket No. 156, p. 12; Adv. Docket No. 156-6, p. 5; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 1; Stipulation by parties].

19. Pursuant to the Pre-Petition Loan Agreement and the Pre-Petition Credit Agreement, Amegy: (1) extended revolving credit loans and term loans (the Pre-Petition Loans) to Bigler in the aggregate principal amount of $67,000,000.00; and (2) issued letters of credit for the benefit of the Debtors in the amount of $1,200,000.00. [Adv. Docket No. 156, p. 12-13; Adv. Docket No. 156-6, p. 5; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

20. Under both the Pre-Petition Loan Agreement and the Pre-Petition Credit Agreement, all of the Debtors except Bigler and Land (in the case of the obligations under the Pre-Petition Credit Agreement), Bigler (in the case of the Pre-Petition Loan

---

[4] Typically, any lienholder who loses a suit over who has the superior lien nevertheless receives some payment under a plan by virtue of being an unsecured creditor (i.e. the losing lienholder becomes an unsecured creditor because there typically is insufficient equity in the property securing the senior lien and junior lien to pay both liens). For example, here, under Article 3.4 of the Plan, Class 4 claimants—which are "Allowed Other Secured Claims"—are entitled to be treated as Class 6 (i.e. unsecured) claimants if they fail to prevail in litigation with Amegy over who has a superior lien. [Main Case Docket No. 642]. However, under Article 3.3 of the Plan, Class 3 claimants—which hold "Allowed Removables Claims" such as Halgo and Shaw—do not receive Class 6 treatment if they lose in their suit with Amegy over who has a superior lien. [Main Case Docket No. 642]. Thus, the Plan's treatment of Halgo and Shaw is equivalent to a high stakes poker game of "winner takes all."

Agreement), and certain non-debtor subsidiaries and affiliates became liable as guarantors for payment of the obligations arising under the Pre-Petition Loan Agreement and the Pre-Petition Credit Agreement (collectively, the Pre-Petition Obligations). [Adv. Docket No. 156, p. 13; Adv. Docket No. 156-6, p. 5; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

21. The Debtors granted Amegy first priority liens on, and security interests in, substantially all of the Debtors' assets—tangible and intangible, real and personal. This was done in order to secure the Pre-Petition Obligations. [Adv. Docket No. 156, p. 13; Adv. Docket No. 156-6, p. 5-6; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

22. As of the Petition Date: (1) the amount due and owing under the revolving credit facility of the Pre-Petition Loan Agreement was $10,040,278.00 (consisting of $10,000,000.00 in principal, plus accrued and unpaid interest), together with all fees, costs, and expenses authorized under the Pre-Petition Loan Agreement and associated documents; (2) the outstanding amount due and owing under the letters of credit issued under the Pre-Petition Loan Agreement and Pre-Petition Credit Agreement equaled $1,050,000.00, plus accrued and unpaid fees, costs and expenses authorized under the same loan documents; and (3) the amount due and owing under the term loans made pursuant to the Pre-Petition Credit Agreement equaled $57,237,594.00 (consisting of $57,000,000.00 in principal, plus accrued and unpaid interest), together with all fees, costs and expenses authorized under the Pre-Petition Credit Agreement and associated documents. [Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 6-7; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

23. The total amount of Amegy's claim as of the Petition Date was $68,327,872.00. [Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 2; Stipulation by parties].

24. Amegy's liens are valid and properly perfected liens on the Debtors' assets. [Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 3; Adv. Docket No. 173, p. 2; Stipulation by parties].[5]

**D.     Halgo Enters Into a Pre-Petition Contract with Bigler**

25. On October 14, 2008, Halgo signed a purchase order (the Contract) with Bigler to provide and furnish two boiler units and related equipment to the HPIB Facility for a total price of $5,929,264.50.   The Contract set forth a progress payment plan by which Bigler was to pay Halgo. [Halgo Ex. 1].

26. The boiler units were delivered to the HPIB Facility on or before April 20, 2009, timely and in accordance with the Contract.   [Adv. Docket No. 156, p. 17; Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by parties].  Halgo supplied the following to the HPIB Facility: two industrial boiler units (Boiler #1 and Boiler #2)[6] and related equipment, including ladders and platforms, sample stations, vent control valves, a deaerator, a water softening system, a boiler blowdown tank, forced draft fans, selective catalytic reductions, burners, ammonia injection grids, duct-work, economizers, stacks, dampers and steam vent silencers, and miscellaneous

---

[5] While the parties have stipulated to this Finding of Fact, Halgo and Shaw disagree with Amegy that Amegy's liens are "non-avoidable first priority liens," which was included in Amegy's Proposed Findings of Fact and Conclusions of Law but was not included in the Pre-Trial Statement. [Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 3; Adv. Docket No. 173, p. 2].

[6] At trial, there were several color photographs introduced into evidence showing Boiler #1 and Boiler #2. [*See*, for example, Halgo Exs. 7, 8, 77 & 79].

instrumentation (collectively, the Boiler System).[7] [Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 12; Adv. Docket No. 173, p. 2; Stipulation by parties].

27. Halgo is considered an equipment packager integrator, which means that it sizes and packages boiler units to meet a customer's system demands. [Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 12; Adv. Docket No. 173, p. 2; Stipulation by parties]. Halgo's witness at trial testified that the package boilers are "built for the specific operating parameters of the customer," which is why Halgo specifies the "capacity that they require— the steam pressure, the steam temperature they need—and that kind of dictates the size of the boiler, how much surface area it has in it, et cetera." [June 29, 2011 Tr. 49:17–24, Roger S. Freeman].[8] Halgo bought the boilers and related equipment from several different manufacturers. [June 29, 2011 Tr. 59:20–60:9, Roger S. Freeman; Adv. Docket No. 156, p.10; Adv. Docket No. 156-6, p. 12; Adv. Docket No. 173, p. 2; Stipulation by parties].

28. Halgo is a "materialman" but not a "mechanic" or "artisan." [Adv. Docket No. 156, p. 24; Stipulation by parties].

29. While Bigler "ultimately told Halgo what they wanted in the boilers," Bigler was not sure what type of boilers it needed at the beginning; Halgo helped Bigler determine the capacity requirements and the types of fuels needed. [June 29, 2011 Tr. 51:6–20, Roger S. Freeman].  Halgo, however, did not manufacture, fabricate, or assemble Boiler #1 or Boiler #2, nor did it supply these boilers from its general inventory.

---

[7] The Court distinguishes between "the Boiler System" and "Boiler #1 and Boiler #2." The former is a reference to Boiler #1, Boiler #2, and all of the equipment related thereto; whereas the latter is a reference to solely the two boiler units themselves. Any reference in this Memorandum Opinion to "the boilers" or "the industrial boilers" or "the boiler units" or "the two boilers" or "these boilers" is a reference to only Boiler #1 and Boiler #2, and not to the Boiler System.

[8] Whenever there is a reference to the transcript, the name of the witness whose testimony is being cited is set forth after the citation to the page and line number of the transcript.

[Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 12; Adv. Docket No. 173 p. 2; Stipulation by parties]. These boilers were manufactured and assembled by an entity named Babcock and Wilcox. [June 29, 2011 Tr. 59:23–25, 65:8–10, 100:4–9, Roger S. Freeman].

30. Boiler #1 and Boiler #2 were transported by railcar to the HPIB Facility and then lifted into place by cranes. [Halgo Ex. 51; June 29, 2011 Tr. 80:8–10, 93:13–94:7, Roger S. Freeman].

31. Halgo did not install the Boiler System at the HPIB Facility. [Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 12; Adv. Docket No. 173, p. 2; Stipulation by parties].

32. On April 20, 2009, Bigler and Halgo signed a subcontract change order (the Subcontract), in which Halgo and Bigler agreed upon the services and payment for the start-up and commissioning of Boiler #1. [Halgo Ex. 12; Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by Halgo and Amegy]. The services required by the Subcontract were completed in June of 2009. [Adv. Docket No. 156, p. 8; June 29, 2011 Tr. 72:11–13, Roger S. Freeman]. Halgo was paid in full for the services it provided under the Subcontract. [June 29, 2011 Tr. 119:22–120:2, Roger S. Freeman; Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by Halgo and Amegy]. The amount due under the Subcontract was $46,528.00. [Halgo Ex. 12].

33. The work done under the Subcontract was anticipated in the Contract, which mandated a "5% retainer to be invoiced upon completion of field testing, not to exceed 120 days after shipment." [Halgo Ex. 1; June 29, 2011 Tr. 58:2–15, Roger S.

Freeman].[9]  On June 11, 2009, Halgo sent Bigler its final invoice under the Contract. [Halgo Ex. 63; June 29, 2011 Tr. 73:12–13, Roger S. Freeman].

34. On July 9, 2009, Bigler issued a promissory note to Halgo in the amount of $533,472.45 for the remaining balance Bigler owed Halgo under the Contract for the Boiler System. [Halgo Ex. 15].

**E.     Pre-petition Actions Taken by Halgo to Establish its Statutory and Constitutional Liens**

35. On September 14, 2009, Halgo recorded its affidavit claiming statutory and constitutional liens in the real property records of Harris County, Texas for two industrial boilers, under clerk's file number 20090417567, in the amount of $533,472.45.   [Halgo Ex. 3; Adv. Docket No. 156, p. 17; Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by parties].

36. The affidavit contained the following:

   a.  A sworn statement that the claim is for the amount of $533,472.45;

   b.  A signature by Jeff Guillot, President of Halgo (Claimant);

   c.  Claimant's physical business and mailing address–811 E. Plano Parkway, Suite 101, Plano, Texas 75074;

   d.  "[C]laimant furnished materials generally described as two (2) industrial boilers;"

   e.  Bigler's address–1920 N. Memorial Way, Suite 201, Houston, Texas 77007; and

---

[9] The labor described as "field testing" in the Contract is the same labor performed under the Subcontract and was referred to at trial by Halgo's witness as "start-up and commissioning." [June 29, 2011 Tr. 58:2–59:8, Roger S. Freeman].

     f.  A real property description of the property upon which Halgo asserted a lien, located at 1000 N. South Street (or alternatively, 1500 N. South Street)[10], Pasadena, Texas 77503.  [Halgo Ex. 3].

37. Halgo's affidavit was recorded prior to the Petition Date.  [Adv. Docket No. 156, p. 17; Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by parties].

**F.    Shaw Enters into a Pre-Petition Agreement with Bigler**

38. On October 10, 2008, Shaw entered into an agreement with Bigler to install pipe spools for the HPIB Facility.  [Shaw Ex. 1; Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 2; Stipulation by parties].  Bigler subsequently entered into a three change orders with Shaw for the fabrication of the pipe spools in addition to their installation.  [July 1, 2011 Tr. 120:14–17, Marcus Deal; Shaw Exs. 2, 3, 4 & 5].  Shaw also installed the Boiler System delivered by Halgo.  [June 29, 2011 Tr. 60:19–22, Roger S. Freeman].

39. Shaw fabricated and installed the pipe spools based upon engineering specifications provided by Bigler.  [Adv. Docket No. 156, p. 14; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 2; Stipulation by parties].

40. The steam piping system fabricated and installed by Shaw is located in the outside battery limits (OSBL) area of the HPIB Facility.[11]  [Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 7; Adv. Docket No. 172, p. 2; Stipulation by parties].

41. Insulation was subsequently applied to a portion of the process piping system, and a portion of the piping system was also painted.  [Adv. Docket No. 156, p. 15,

---

[10] It is unclear to this Court why Halgo's affidavit refers to 1000 N. South Street, but then immediately refers, in the alternative, to 1500 N. South Street.  No explanation was given at trial.  Nor did Amegy mention this discrepancy. In any event, the Court finds that the affidavit is in no way invalidated due to this apparent inconsistency.

[11] At trial, there were several color photographs introduced into evidence showing the piping systems. [*See*, for example, Shaw Exs. 35, 38, 39, 46 & 49].

Stipulation by parties]. Shaw neither installed the insulation nor painted the piping system. [June 29, 2011 Tr. 192:25–193:1, Michael K. Irish; Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties]. Third parties did these jobs. [June 29, 2011 Tr. 169: 2–4, 172:11–14, Michael K. Irish; Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties].

42. Shaw completed the fabrication and installation of the process piping system on March 23, 2009. [Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties]. On July 17, 2009, Bigler issued a promissory note to Shaw in the amount of $1,396,295.39 for the balance Bigler owed Shaw under the agreement and the subsequent three change orders. [Shaw Ex. 9].

**G.    Pre-Petition Actions Taken by Shaw to Establish its Constitutional and Statutory Liens**

43. On September 14, 2009, Shaw recorded its affidavit for a mechanic's lien in the real property records of Harris County, Texas, under clerk's file number 20090419145, in the amount of $1,400,544.99.[12] [Shaw Ex. 11; Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties]. Shaw asserts statutory and constitutional liens on Bigler's property located at 1500 North South Street, Pasadena, Texas 77503 (i.e. at the HPIB Facility) for "labor, materials and equipment necessary for the boiler installation work, pipe spools fabrication work and janitorial work for construction . . . ." [Shaw Ex. 11].

---

[12] The amount of $1,400,544.99 is greater than the principal amount of $1,396,295.39 set forth in the promissory note that Bigler issued to Shaw. The difference is $4,249.60. Because the interest rate on the note is 10% per annum, and because the effective date of the note is June 17, 2009 and the date of the affidavit is September 14, 2009, the amount of interest that accrued during these 89 days was $34,046.65. It is unclear to this Court why only $4,249.60 of interest was added to the principal amount when the affidavit was filed.

44. Shaw's affidavit was recorded prior to the Petition Date.  [Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties].

45. The principal amount owed under the promissory note, $1,396,295.39, issued by Bigler to Shaw remains unpaid. [Shaw Ex. 9; Adv. Docket No. 156, p. 5]. Of the total amount owed to Shaw of $1,400,544.99, the amount of $829,651.00 is attributable to the fabrication and installation of the process piping system at the HPIB Facility. [Shaw Ex. 8; Adv. Docket No. 156, p. 16; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties].  The remaining amount of $570,893.99 is attributable to other labor, materials, and equipment necessary for the services and materials provided by Shaw regarding matters not related to the process piping system—for example, installation work relating to the boilers and janitorial work for construction. [Shaw Ex. 11].

46. Shaw admits that it failed to timely perfect its statutory lien.[13] [Adv. Docket No. 156-6, p. 16; Adv. Docket No. 172, p. 2; Adv. Docket No. 173, p. 3; Stipulation by parties].

47. Shaw is a "mechanic" or "artisan." [Adv. Docket No. 156, p. 24; Adv. Docket No. 156-6, p. 17; Adv. Docket No. 173, p. 2; Stipulation by parties].

48. Shaw is entitled to a constitutional lien on the process piping system that it fabricated and installed at the HPIB Facility. [Adv. Docket No. 156, p. 24; Adv. Docket No. 156-6, p. 18; Adv. Docket No. 173, p. 2; Stipulation by parties].

---

[13] Contrary to its statement in its affidavit for mechanic's lien, by the close of trial, Shaw admitted that it failed to timely perfect its statutory lien.

## H.   Background of the Pending Adversary Proceeding

49. On July 8, 2010, Amegy filed its Complaint for Declaratory Judgment and to Determine Extent, Validity, and Priority of M&M Liens (the Complaint) against multiple defendants. [Adv. Docket No. 1]. The Complaint seeks a judicial determination as to the extent, validity, and priority of certain mechanics' and materialmen's liens claimed by all of the defendants—including Halgo and Shaw—for amounts owed for materials supplied to the HPIB Facility.  [Adv. Docket No. 1]. Prior to trial, Amegy reached settlements with all defendants except Halgo and Shaw; Halgo and Shaw remain the only defendants in this suit.

50. On July 29, 2010, Halgo filed its Answer to the Complaint.  [Adv. Docket No. 54]. This answer asserts that Halgo has a perfected and superior lien on "removables" it supplied to the HPIB Facility and seeks the following relief: (1) a declaratory judgment that it has a valid lien on the two boilers and that this lien is superior to Amegy's liens; and (2) its attorneys' fees. [Adv. Docket No. 54]. On August 6, 2010, Shaw filed its Answer and Counterclaim in Response to the Complaint. [Adv. Docket No. 56].  This answer similarly asserts that Shaw has a superior lien on "removables" it supplied and seeks the following relief: (1) a declaratory judgment that the process piping system it installed is a "removable," that Shaw has a validly perfected mechanic's lien, and that this lien is superior to Amegy's liens; and (2) its attorneys' fees.  [Adv. Docket No. 56].

I.     **The Removability of Halgo's Boiler System or, Alternatively, Boiler #1 and Boiler #2[14]**

51. Boiler #1 and Boiler #2 sit on concrete pads that are physically separated from the remainder of the HPIB Facility. [Adv. Docket No. 156, p. 8]. Boiler #1 and Boiler #2 are located in the OSBL area of the HPIB Facility.[15] [June 29, 2011 Tr. 165:10–12, Michael K. Irish].

52. After Halgo supplied the Boiler System, parts of the Boiler System were insulated, including the economizers and the duct-work; however, insulation was not added to the boilers themselves. [June 29, 2011 Tr. 213:24–214:9, Michael K. Irish]. Halgo did not supply the added insulation. [Halgo Exs. 13 & 14; June 29, 2011 Tr. 214:2–9, Michael K. Irish].

53. In order to remove Boiler #1 and Boiler #2, Halgo would need to unbolt the equipment from the concrete pad and disconnect various pipes and conduits. [Adv. Docket No. 156, p. 8]. The boilers could then be lifted up from the concrete pads by cranes or pulled off the pads horizontally by a rig. [June 29, 2011 Tr. 82:1–10, 92:20–96:20, Roger S. Freeman].

54. Boiler #1 and Boiler #2 have permanent metal rungs on the top of the units that are specifically designed to assist in their removal by crane. [Amegy Ex. 1, Ex. A, photos 29 & 30; June 29, 2011 Tr. 94:3–12, Roger S. Freeman; June 30, 2011 Tr. 33:11–34:4, Robert G. James].

---

[14] As set forth in Finding of Fact No. 26 and Footnote No. 7, the phrase "Boiler System" refers to Boiler #1 and Boiler #2, plus all of the related equipment; whereas reference to "Boiler #1 and Boiler #2" concerns solely these two boiler units. At trial, Halgo's counsel argued that the Boiler System is removable; however, he made an alternative argument that even if the Boiler System does not constitute a removable, the two boiler units (i.e. Boiler #1 and Boiler #2) alone each constitute a removable.

[15] As already noted, the "OSBL area" refers to the area known as outside battery limits.

55. If the boilers were removed, Halgo would be able to cap the remaining exposed pipes and wires. [June 29, 2011 Tr. 79:2–10, 139:1–11, Roger S. Freeman].

56. To remove the auxiliary equipment (i.e., the deaerator, burners, duct-work, and economizers), Halgo would need to remove the metal jacketing covering the insulated portion of the equipment used for heat conservation and personnel protection, as well as disconnect the tubing and piping connecting the instruments. The equipment that is attached to the boiler units and the ground, either by anchor bolts and grout at the concrete foundations or by bolts attached to an elevated steel support structure, would need to be unbolted. The duct-work would need to be torch-cut or unbolted into shippable sections. [Amegy Ex. 1, p. 37-38].

57. Boiler #2 has never been used and can be sold as new. Boiler #1 can be re-sold as a used boiler. [June 29, 2011 Tr. 76:15–22, 77:2–13, Roger S. Freeman].

58. It is not uncommon for Halgo to rent boiler units. [June 29, 2011 Tr. 102:3–14, Roger S. Freeman]. Halgo is currently in the process of removing a "surplus or used boiler" for a client at a different facility, in which the boilers will be disassembled and moved to a new facility. [June 29, 2011 Tr. 50:7–13, Roger S. Freeman].

59. Removal of the Boiler System would require: (a) dissembling the tubing and piping for removal of instruments and valves; and (b) breaking of grouted surfaces. [Adv. Docket No. 156-6, p. 13; Adv. Docket No. 173, p. 2; Stipulation by Halgo and Amegy].

60. Opened flanges for piping at Boiler #1 and Boiler #2 and tubing connections for instrumentation would suffer loss of non-reusable stud bolts, stainless flange gaskets

and tubing bushings and ferrules if removed from their installed assembly. [Adv. Docket No. 156-6, p. 13-14].

61. The collective value of Boiler #1 and Boiler #2 is $2,000,000.00. [Adv. Docket No. 156-6, p. 15; Adv. Docket No. 173, p. 3; June 29, 2011 Tr. 77:2–13, Roger S. Freeman; June 30, 2011 Tr. 126:7–127:7, 133:9–20, Robert S. Nall].[16]

## J.   The Removability of Shaw's Process Piping System

62. Shaw supplied and installed 306 pipe spools at the HPIB Facility.  [Shaw Ex. 25]. The piping system is completely installed and operable. [June 30, 2011 Tr. 10:1–4, Robert G. James; Adv. Docket No. 156-6, p. 10; Adv. Docket No. 172, p. 2; Stipulation by Shaw and Amegy].

63. Individual pipe spools are periodically removed and replaced in the ordinary course of repair work [July 1, 2011 Tr. 134:10–135:7, Marcus Deal]; however, the

---

[16] Halgo's sole witness, Roger S. Freeman, credibly testified that one of the boilers—the new unit (i.e. Boiler #2)—could be sold for as much as $3.0 million, and for as little as $2.5 million; and that the used boiler (i.e. Boiler #1) could be sold for as much as $2.5 million and as little as $1.75 million. [June 29, 2011 Tr. 77:2–13, Roger S. Freeman].  One of Amegy's expert witnesses, Robert S. Nall, credibly testified that the two boilers collectively could be sold for as much as $1.4 million and as little as $1.3 million. [June 30, 2011 Tr. 126:7–9, Robert S. Nall]. Because both of these witnesses were credible witnesses who are knowledgeable about the value of boilers in this industry, the Court finds that the approximate value of the boilers in the aggregate is at least $2.0 million. Furthermore, the Court finds that the approximate value of the new unit (i.e. Boiler #2) is at least $650,000.00.

The Court would note that even if it completely disregarded Roger S. Freeman's testimony and accepted only Robert S. Nall's testimony, the net result of the Court's finding would not change the result of the decision as to Halgo in this lawsuit. Amegy's own expert (i.e. Robert S. Nall) testified that the collective value of the two boilers is at least $1.3 million. [June 30, 2011 Tr. 126:7–9, Robert S. Nall]. There is absolutely no dispute that the amount of Halgo's claim is $533,472.45. Accordingly, there can be no doubt that even using the lowest value given by Amegy's own expert appraiser, Halgo is a vastly oversecured creditor. Accordingly, under the terms of the Plan, if Halgo proves that its materialman's lien is superior to Amegy's liens, then the entire $533,472.45 will be paid to Halgo.

The Court notes that under a plain reading of the Plan, Amegy would have to pay not the $533,472.45, but rather cash "equal to the value of the Collateral"—i.e. $2.0 million (the value of Halgo's collateral).  However, for reasons subsequently discussed in this Opinion, this Court will require that Amegy only pay Halgo the amount of its claim (plus fees), not cash in the amount of the value of the two boilers. If the Court actually enforced the literal interpretation of the language in the Plan, then Amegy would have to pay Halgo the amount of the two boilers—and then there is no question that the finding the Court makes as to the value of these two boilers would make a marked difference as to the outcome of this suit.

assembled process piping system is not designed to be replaced as part of ordinary maintenance. [Amegy Ex. 1, p. 26; June 30, 2011 Tr. 9:18–25, Robert G. James].

64. To remove its process piping system, Shaw would need to saw and/or torch-cut the pipes at the welding seams and break apart the flanged connections to reduce the pipes into a transportable size. [June 29, 2011 Tr. 236:2–9, 237:1–3, Robert G. James].

65. Sawing and torch-cutting the pipes at the welding seams would result in a loss of pipe of approximately one and a half feet to fifteen feet.[17]

66. If the process piping system was removed, the remaining pipes, valves, and tanks would not be harmed by environmental elements if properly capped. [June 30, 2011 Tr. 61:16–25, Robert G. James].

67. Shaw did not supply or install the insulation covering the process piping system. [July 1, 2011 Tr. 79:16–18, Gerald Morrow; Adv. Docket No. 156, p. 15; Adv. Docket No. 156-6, p. 8; Adv. Docket No. 172, p. 2; Stipulation by parties]. The insulation covers approximately forty percent of Shaw's process piping system. [June 29, 2011 Tr. 187:15–17, Michael K. Irish].

68. Some of the process pipe is covered with detachable insulation blankets, which can be unstrapped and removed and then stacked on site. [Shaw Ex. 28, p. 3; June 29, 2011 Tr. 235:6–15 & 236:15–20, Robert G. James].

---

[17] At trial, there was conflicting testimony as to the amount of pipe that would be lost upon removal. Dr. Claude R. Mount, Shaw's expert witness, testified that approximately one and a half feet would be lost [July 1, 2011 Tr. 172:24–173:4, Dr. Claude R. Mount]; however, Robert S. Nall, Amegy's expert witness, testified that the removal process would result in a loss of twelve to fifteen feet, [June 30, 2011 Tr. 55:6–9, Robert S. Nall]. Even if this Court accepts Nall's estimate—up to fifteen feet of pipe loss—the Court finds that a loss of fifteen feet of pipe is not a material loss in comparison to the 4,515 feet of total pipe that Shaw installed at the HPIB Facility. [June 30, 2011 Tr. 157:5–8, Robert S. Nall; July 1, 2011 Tr. 172:15–18, Dr. Claude R. Mount].

69. In order to remove the insulation from the pipes, the metal bands securing the insulation would need to be cut and the metallic jackets covering the insulation would need to be set aside. [July 1, 2011 Tr. 32:7–17, Gerald Morrow].  The insulation is not designed for removal and replacement; therefore, removing the insulation would destroy it, and render it unusable.[18]  [Amegy Ex. No. 1, p. 29].

70. The primer and paint—materials that were not applied by Shaw—cannot be feasibly isolated from the pipes.  [Amegy Ex. No. 1, p. 29; June 30, 2011 Tr. 6:8–15, Robert G. James].

71. The 2,700 bolts securing the flanged connections can be removed and undone in the ordinary course of maintenance. [Amegy Ex. 3].

72. It is not standard industry practice to re-use bolts, and the bolts would not likely be re-used in a subsequent project, as the bolts may suffer stress upon tightening and loosening. [June 30, 2011 Tr. 73:21–74:5, Robert G. James; Amegy Ex. No. 1, p. 27].[19]

73. The flanged connections are designed to be opened for repairs and maintenance. [Shaw Ex. 29, p. 2; June 30, 2011 Tr. 43:17–23, Robert G. James].

---

[18] There was conflicting testimony at trial as to whether the insulation would be reusable upon removal.  Robert G. James and Robert S. Nall—Amegy's expert witnesses—testified that the insulation would be damaged and unusable, while Marcus Deal—Shaw's witness—testified that the insulation, if carefully removed, could be reusable [June 30, 2011 Tr. 63:16–22, Robert G. James; June 30, 2011 Tr. 155:11–156:4, Robert S. Nall; July 1, 2011 Tr. 137:6–138:2, Marcus Deal].  Interestingly, and in seeming conflict to Marcus Deal's testimony, Dr. Claude R. Mount—Shaw's expert—testified that he considered the insulation "waste material," and in his expert report, he noted, that "no special effort [would] be made to remove/preserve the insulation."  [Shaw Ex. 28, p. 3; July 1, 2011 Tr. 189:23–191:5, Dr. Claude R. Mount].  Moreover, Gerald Morrow—another one of Shaw's witnesses—testified that the insulation would be damaged. [July 1, 2011 Tr. 47:5–7, Gerald Morrow].  Having heard all of the testimony, this Court finds that removal of the insulation would destroy it and render it unusable.

[19] James' report expressly states that: "Because previously tightened stud bolts (ASTM grade B7) at equipment flanges have undergone unknown stresses and possible elongation, these items are considered damaged and unacceptable by most users—not reusable once removed."

74. The metal flange gaskets have been compressed to seal the flange connections. Breaking the flanged connections would destroy the gaskets, and the gaskets would be unusable once the seams are broken apart. [Amegy Ex. No. 1, p. 27; June 29, 2011 Tr. 238:14–18, Robert G. James; Adv. Docket No. 156, p. 16].

75. There are approximately 300 gaskets of various sizes in the flanged connections. [Amegy Ex. 3].

76. The various instruments and gauges attached to the piping system that Shaw did not supply can be removed and set aside without damaging the instruments. [June 30, 2011 Tr. 8:20–9:13, Robert G. James].

77. Removal of the piping system would not materially injure the land on which the HPIB Facility is located. [Adv. Docket Nos. 156, p. 16; Stipulation by parties].

78. Removal of any piece of the process piping system would result in a shutdown of the HPIB Facility. [June 30, 2011 Tr. 9:14–17, Robert G. James].

## IV. EXHIBITS INTRODUCED AT TRIAL, CREDIBILITY OF WITNESSES, AND WEIGHT GIVEN TO THEIR TESTIMONY

### A. Exhibits

At the pretrial conference, the Court admitted into evidence the following exhibits: Amegy's Exhibits 1-66 and 68-70, (67 was withdrawn); Halgo's Exhibits 1-103; and Shaw's Exhibits 1-56. [Courtroom Minutes 06/23/2011]. The Court admitted into evidence Shaw's amended Exhibit List 1-56 on June 20, 2011. [Adv. Docket No. 160]. The Court also subsequently admitted Amegy's exhibits 71 and 72. [Courtroom Minutes 07/01/2011].

### B. Witness Credibility and Weight Given to Testimony

"It is this court's duty to assess and weigh the credibility of witnesses." *Andrews v. United States*, 130 F. Supp. 2d 815, 819 (S.D. Miss. 2000) ((citing *Port Arthur Towing Co. v. John W. Towing, Inc. (In re Complaint of Port Arthur Towing Co.)*, 42 F.3d 312, 318 (5th Cir. 1995) (citing *Turnage v. Gen. Electric Co.*, 953 F.2d 206, 212 (5th Cir. 1992) ("Weighing conflicting evidence and inferences and determining the relative credibility of witnesses to resolve factual disputes is the [factfinder's] province.")).

The following witnesses testified:

### 1.      Roger S. Freeman

Roger S. Freeman (Freeman) is the Vice President of Sales at Halgo. [June 29, 2011 Tr. 47:7–8, Freeman].  Freeman testified on June 29, 2011.[20]  The Court finds that Freeman is a very credible witness, and thus gives substantial weight to his testimony.

### 2.      Michael K. Irish

Michael K. Irish (Irish), a witness for Amegy, testified on June 29, 2011.  Irish is presently employed at Enterprise (i.e. the entity that ended up owning the assets of the Debtors). [June 29, 2011 Tr. 161:12–16, Irish].  He was formerly employed by Bigler, but lost his job when the assets of these entities were sold in the course of the Chapter 11 case.  [June 29, 2011 Tr. 161:20–22, Irish].  While working for Bigler, he was the lead program manager in overseeing the installation of the boilers and the piping system. [June 29, 2011 Tr. 167:11–19, 168:3–6 & 175:14–20, Irish].

Irish was a testy witness who was not particularly enamored with either Halgo or Shaw; apparently he was unhappy with the unwillingness of these two creditors to give the Debtors

---

[20] Halgo's witness was taken out of turn due to scheduling conflicts.

more time to pay off their debts so as to preserve the business (and obviously his job).[21]  From time to time during his testimony, he seemed bent on trying to give testimony that, in his mind, would be harmful to Halgo and Shaw. Nevertheless, Irish is clearly knowledgeable about the HPIB Facility, and he was responsive to several questions about various aspects of the Facility. Accordingly, the Court finds Irish to be a credible witness and gives a fair amount of weight to his testimony.

### 3.    Robert G. James

Robert G. James (James), the first expert witness called by Amegy, testified on June 29, 2011 and June 30, 2011. James is a Registered Professional Engineer in Florida and Texas. He received his Bachelor of Engineering from McGill University in Montreal.  [June 29, 2011 Tr. 221:9–17, James].   He has approximately fifteen years of experience in refining and petrochemical projects; he has managed the design and the construction of these projects for plants such as the HPIB Facility. [June 29, 2011 Tr. 222:3–11, 223:1–21, James].  James has also been involved in dismantling petrochemical plants. [June 29, 2011 Tr. 223:16–21, James].  At trial, he responded to all questions forthrightly.  There was only one point which he made during his testimony about which this Court is skeptical.  Specifically,  he testified that of the 4,500 feet of piping at the HPIB Facility, removal of the piping system would significantly damage at most 15 feet of piping (i.e. 0.3% of total piping); and then he testified that in his opinion, this would be a material loss.  [June 30, 2011 Tr. 45:9–13, 55:6–13 & 56:7–57:17, James].  The Court finds it difficult to believe that 0.3% constitutes a material loss.

---

[21] For example, when Halgo's attorney asked Irish a question which expressly assumed that one of the boilers was nonfunctional—a reasonable question in this particular suit—Irish refused to accept that assumption and insisted that Bigler had sufficient maintenance forces to repair the boiler. And, even when Halgo's lawyer once again asked Irish to assume that the boiler could not be repaired, Irish cut off the question being posed to him and insisted that: "It can be repaired. It's just that Bigler ran out of money and we didn't get a chance to finish it. There's nothing wrong with the boiler." [June 29, 2011 Tr. 185:13–186:1, Irish].

In sum, the Court finds James to be a credible witness and gives substantial weight to his testimony.

### 4.    Robert S. Nall

Robert S. Nall (Nall), an expert witness for Amegy, testified on June 30, 2011. Nall has a B.A. in Mechanical Engineering and does cost estimates for Ventech Appraisal Services. [June 30, 2011 Tr. 85:8–86:5, Nall]. Amegy retained him to opine on the value of the items supplied by Shaw and Halgo to the HPIB Facility. [June 30, 2011 Tr. 83:6–16, Nall]. The Court finds that Nall is a credible witness and gives substantial weight to his testimony.

### 5.    Gerald Morrow

Gerald Morrow (Morrow) is a project manager for Shaw. [July 1, 2011 Tr. 6:4, Morrow]. Morrow testified on July 1, 2011. He has approximately twenty-eight years of experience in pipe fabrication for process plants such as the HPIB Facility. [July 1, 2011 Tr. 8:3–5, Morrow]. He was also a pipefitter at one time and has also been a pipefitter supervisor. He is presently the manager of pipe fabrication for Shaw. [July 1, 2011 Tr. 8:6–11, Morrow]. His testimony concerned almost entirely issues regarding the piping system at the HPIB Facility. He had no involvement Shaw's installation of the boilers. [July 1, 2011 Tr. 49:22–24, Morrow]. Morrow answered questions forthrightly and was a credible witness. The Court gives substantial weight to his testimony.

### 6.    Marcus Deal

Marcus Deal (Deal) is the regional Vice President of Shaw. [July 1, 2011 Tr. 117:20. Deal]. Deal testified on July 1, 2011. He is responsible for the maintenance and capital construction of Shaw's office in LaPorte, Texas. In the past, he was a pipefitter for several years. He is familiar with the materials that Shaw provided to Bigler at the HPIB Facility. [July 1, 2011

Tr. 117:19–119:3, Deal]. Deal answered questions forthrightly and was a credible witness. The Court gives substantial weight to his testimony.

### 7.    Dr. Claude R. Mount

Dr. Claude R. Mount (Mount), an expert witness for Shaw, testified on July 1, 2011. Mount is a metallurgical engineer and a Registered Professional Engineer in Louisiana. He received his B.S. in Physics from LSU in 1971, a Master's degree in Mechanical Engineering in 1977, and a Ph.D. in Engineering Science in 2000. [July 1, 2011 Tr. 156:20–157:23, Mount]. Presently, he is the principal metallurgical engineer for PAI Engineering and Piping Analysis, Inc. [July 1, 2011 Tr. 156:18–158:22, Mount]. While he is heavily degreed and did a written report, Dr. Mount failed to physically inspect the HPIB Facility; rather, he simply drove out to the Facility in his car and drove around for 5 minutes. [July 1, 2011 Tr. 200:13–20, Mount]. The Court has concerns about the credibility of any expert witness asked to opine on whether the piping system at a certain location is a removable when that witness has failed to physically walk around the Facility to personally view the piping system.   Accordingly, although Dr. Mount responded forthrightly to the questions posed to him, the Court discounts his testimony to a certain extent.  Overall, the Court gives some weight to his testimony.

### 8.    Transcripts of Deposition Testimony Read into the Record

Portions of the deposition transcripts of Sandra Terry (Terry)[22] were read into the record by Amegy's and Shaw's counsel. [June 30, 2011 Tr. 174:10–185:7]. Portions of the deposition transcripts of Freeman were also read into the record by Halgo's counsel.  [June 30, 2011 Tr. 185:4–188:13]. The Court cannot assess Terry's credibility, as she did not give live testimony in the courtroom, and the testimony that she gave which was read into the record was very

---

[22] Terry is the Project Accounting Manager for Halgo.  [June 30, 2011 Tr. 177:4–11].

abbreviated. The Court has already found Freeman to be a very credible witness, and sees no reason to give his deposition testimony, which was also very abbreviated, the same substantial weight that it gave to his live testimony.

## V. CONCLUSIONS OF LAW

### A. Jurisdiction, Constitutional Authority to Enter a Final Judgment, and Venue

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(K) & (O).

Having made this conclusion of law as to subject matter jurisdiction, this Court nevertheless notes that the Supreme Court has recently issued its watershed opinion in *Stern v. Marshall*. This decision set forth certain limitations on the constitutional authority of bankruptcy courts to enter final judgments. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). The undersigned judge is therefore required to analyze whether he has the constitutional authority to enter a final judgment in this particular adversary proceeding.

*Stern* concerned a bankruptcy court's authority to enter a final judgment over a debtor's common law counterclaim to a proof of claim filed against the estate. *Id.* at 2600-01. The debtor had brought the counterclaim pursuant to 28 U.S.C. § 157(b)(2)(C)—which, up until *Stern*, was a dispute in which a bankruptcy court could sign a final judgment in accordance with 28 U.S.C. § 157(b)(1). *See id.* In *Stern*, the Supreme Court held that contrary to § 157(b)(1), a bankruptcy court may not constitutionally enter a final judgment on a counterclaim that would not necessarily be resolved through adjudication of the proof of claim. *Id.* at 2621. Importantly, the particular counterclaim in *Stern* did not constitute a "public rights" dispute. *Id.* at 2611. A public rights dispute may be decided by non-Article III tribunals, but such a dispute must involve

rights "integrally related to a particular federal government action." *Id.* at 2613. Entering a final judgment with respect to the counterclaim based upon a private right would be an impermissible exercise of the judicial power of the United States. *Id.* at 2611.

The broader applicability of the Supreme Court's decision remains unclear. Other types of disputes frequently decided by bankruptcy courts may now also require final adjudication by Article III courts. A bankruptcy court's authority over matters involving state law causes of action is particularly questionable. Indeed, just as the debtor's counterclaim in *Stern* was based entirely upon state law, the law governing the dispute in this adversary proceeding is based entirely upon state law.[23]   Accordingly, at first blush, it would appear that the undersigned Article I judge does not have the constitutional authority to enter a final judgment in this adversary proceeding. However, for the reasons set forth below, this Court concludes that it does have such authority.

This Court may exercise authority over matters integral to the bankruptcy scheme under the "public rights" exception articulated in *Stern*. Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III judge. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, **the equitable distribution of that property among the debtor's creditors**, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363-64

---

[23] The Plan is a contract and is binding on all parties involved, including Amegy, Halgo, and Shaw. *In re Nat'l Gypsum Co.*, 257 B.R. 184, 203 (Bankr. N.D. Tex. 2000); *In re E-H Farms*, 238 B.R. 661, 663 (Bankr. N.D. Tex. 1999); *see also* Article 14.18 of the Plan, which expressly binds the holders of claims such as the three parties involved in this lawsuit. Further, Article 14.16 of the Plan provides that Texas law governs in the absence of federal law [Finding of Fact No. 13]; and, the determination of the priority of each party's lien can only be made by reference to Texas law.

(2006) (emphasis added); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 131 S. Ct. at 2614, n.7 ("We noted that we did not mean to suggest that the restructuring of debtor-creditor relations is in fact a public right . . . . Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here.") (internal quotations omitted).

Here, this suit concerns a dispute that must be resolved in order to determine the appropriate distribution among the Debtors' creditors.  The determination of lien priority on assets that were once property of the bankruptcy estate are part of the "public rights" exception, as it involves the exercise of the Bankruptcy Court's *in rem* jurisdiction over the estate.[24]  *Id.* at 2618 (noting that when determining whether Congress may bypass Article III, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims adjudication process.").

Moreover, disputes over rights created by the Bankruptcy Code itself as part of the public bankruptcy scheme also fall within the "public rights" exception.  *See Thomas*, 473 U.S. at 593 (allowing non-Article III adjudication of rights created by a public regulatory scheme).  Here, the resolution of this dispute was contemplated by a confirmed bankruptcy plan.  In determining who would get a slice of the bankruptcy pie and how big the slice would be, the Plan expressly contemplates that Amegy, Halgo, and Shaw would be fighting over lien priorities.  Indeed, Article 3.3 in the Plan expressly provides, in relevant part, that "[E]ach holder of an Allowed Removables Claim shall receive . . . payment in Cash by Amegy equal to the *value of the Collateral* securing its Lien, as determined by the Bankruptcy Court in [the] M&M Lien Priority

---

[24] In simpler terms, if a bankruptcy court can enter a final judgment on anything, it would be a final order resolving a dispute as to who gets a slice of the pie and how big that slice is.

Adversary . . . ." [Finding of Fact No. 14] (emphasis added). Further, the Plan expressly defines the "M&M Lien Priority Adversary" as "the adversary proceeding styled *Amegy Bank National Association v. Brazos M&E, Ltd, et al.*, pending in the Bankruptcy Court under Adv. Pro. No. 10-03304." [Finding of Fact No. 15].

Hence, resolution of the lawsuit pending in this Court arises from an express provision of the Plan, the very purpose of which is to distribute cash to the prevailing party or parties— thereby accomplishing the very objective of the public right known as the bankruptcy process (i.e. paying claims of creditors).  *See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 188 B.R. 799 807 (E.D. La. 1995) *aff'd sub nom. Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997).  Therefore, not only does this lawsuit involve a right integral to the bankruptcy scheme—the determination of lien priority— but it also involves a right created by the Bankruptcy Code—distribution of property of the estate to creditors pursuant to the Plan.  Accordingly, this dispute falls within the undersigned judge's constitutional authority to enter a final judgment.

Venue is proper pursuant to 28 U.S.C. § 1409.

**B.**    **Mechanics' and Materialmen's Liens**

Under Texas law, there are two types of mechanics' and materialmen's liens: (1) statutory liens; and (2) constitutional liens. Mechanic's and materialman's lien statutes are liberally construed to protect laborers and materialmen.   *See Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 723 (Tex. 2003); *First Nat'l Bank in Dall. v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974).

32

1.    <u>Statutory Liens</u>

Under the Texas Property Code, an individual has a valid statutory mechanic's and materialman's lien if "the person labors, specially fabricates the material, or furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent." Tex. Prop. Code § 53.021(a) (West 2007). In order to perfect a lien, a party must "file an affidavit with the county clerk of the county in which the property is located . . . not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues." *Id.*

a.    *Halgo has a Valid Statutory Materialman's Lien*

This Court concludes that Halgo has a valid and properly perfected statutory lien. First, Halgo furnished the Boiler System pursuant to the Contract with Bigler.[25] [Finding of Fact No. 25]. This satisfies § 53.021(a). Second, this Court concludes the Contract and Subcontract are sufficiently one contract for the purposes of the filing of the statutory lien. The boilers were supplied on or before April 20, 2009. [Finding of Fact No. 26]. However, the start-up and commissioning work was not completed until June of 2009. [Finding of Fact No. 32]. The ability for Halgo to invoice the final bill of the Contract rested upon the completion of field testing. [Finding of Fact No. 33]. The 5% retainer anticipated continued work on the items supplied in the Contract, as represented by the Subcontract. [Finding of Fact No. 33].

Third, under the Texas Property Code, indebtedness to an original contractor accrues "on the last day of the month in which the original contract has been completed, finally settled, or abandoned." Prop. § 53.053(b)(2). Moreover, "'[c]ompletion' of an original contract means the actual completion of the work, including any extras or change orders reasonably required or

---

[25] Because Halgo's affidavit states "[c]laimant furnished materials generally described as two (2) industrial boilers" and did not mention the related equipment [Finding of Fact No. 36d], Halgo's statutory lien does not extend to the Boiler System, but is limited to Boiler #1 and Boiler #2.

contemplated under the original contract . . . ." *Id.* § 53.001(15).  In the suit at bar, the Contract

could not be completed or settled until the conditions of the five percent retainer were fulfilled—

either via the passage of time or completion of the commissioning work.  *Page*, 102 S.W.3d at

721.  Here, the start-up and commissioning done under the Subcontract was completed in June of

2009 [Finding of Fact No. 32], and on June 11, 2009, Halgo sent Bigler its final invoice under

the Contract.[26] [Finding of Fact No. 33].  Thus, under the statute, the "last day of the month in

which the original contract has been completed . . ." is June 30, 2009.  And, also under the

statute, the indebtedness owed by Bigler to Halgo under the Contract accrued on June 30, 2009.

Thus, the deadline for Halgo to file its materialman's lien affidavit was no later than the 15th day

of the fourth calendar month after June 30, 2009—i.e. no later than October 15, 2009.  In fact,

Halgo filed its materialman's lien affidavit with the County Clerk of Harris County, Texas on

September 14, 2009.  [Finding of Fact No. 35].  Thus, Halgo timely filed its affidavit.

With the Court having concluded that Halgo timely filed its affidavit, the Court must now

determine whether the contents of the affidavit are sufficient.  Under the Texas Property Code,

an affidavit must substantially contain: (1) a sworn statement as to the dollar amount of the

claim; (2) the name and address of the owner or reputed owner; (3) a general statement of the

kind of work done and materials furnished by the claimant; (4) the name and address of the

person by whom the claimant was employed or to whom the claimant furnished the materials or

labor; (5) the name and address of the original contractor; (6) a description, legally sufficient for

identification, of the property sought to be charged with the lien; and (7) the claimant's name and

---

[26] Reference to "the Contract" necessarily includes reference to "the Subcontract" because the Subcontract was a change order relating to the Contract.  Thus, the work anticipated under the 5% retainer (i.e. the field testing, otherwise known as the "start-up and commissioning") means that the deadline for filing the affidavit is not determined by reference to April 20, 2009 (i.e. the date the two boilers were delivered), but rather by reference to June 11, 2009 (i.e. the date that Halgo sent Bigler a final invoice after Halgo had completed the field testing in early June of 2009). *See Page*, 102 S.W.3d at 721 ("[W]ork must be defined in relation to a particular contract"); Prop. § 53.001(14) (defining work as "any part of construction or repair performed under an original contract").

mailing address.   Prop. § 53.054(a). Here, Halgo's affidavit complies with all statutory requirements. *See* [Finding of Fact Nos. 35 & 36(a–f)].

Moreover, an affidavit is not required "to set forth individual items of work done or material furnished or specially fabricated." *Id.* § 53.054(c). This Court concludes that the content of Halgo's affidavit sufficiently complies with § 53.054, including a satisfactory "general statement" when it generally described the materials furnished.[27] *See id.* §§ 53.054(a)(3), (c).

Halgo's omission of the statement of labor completed during the commissioning and delivery of the boiler units does not offend the substantial compliance standard required by the statute.[28] *See id.* § 53.054 (noting that lien affidavits must substantially contain the required information); *Truss World, Inc. v. ERJS, Inc.*, 284 S.W.3d 393, 395 (Tex. App.—Beaumont 2009, pet. denied) ("Form requirements for materialmen's lien affidavits are to be liberally construed . . . .").

Substantial compliance requires that the two contracting parties are not prejudiced by the omission in the affidavit. *See Ready Cable, Inc. v. RJP S. Comfort Homes, Inc.*, 295 S.W.3d 763, 765 (Tex. App.—Austin 2009, no pet.), *reh'g overruled* (Sept. 21, 2009) (citing *Mustang Tractor & Equip. Co. v. Hartford Accident & Indem. Co.*, 263 S.W.3d 437, 441 (Tex. App.—Austin 2008, pet. denied) ("[C]ourts have been more willing to excuse a mistake or omission in cases where no party is prejudiced by the defect.")).

In *Milner v. Balcke-Durr, Inc.*, the Texas Court of Appeals held that compliance with § 53.054(a)(3) was essential to the perfection of a statutory lien. No. 03-05-00547-CV, 2006 WL 2190516, at *3 (Tex. App.—Austin Aug. 4, 2006, no pet.).  The suit at bar is distinguishable.

---

[27] The relevant section of Halgo's affidavit stated: "[c]laimant furnished materials generally described as two (2) industrial boilers." [Finding of Fact No. 36d].

[28] The omission of a statement of labor and its relation to the sufficiency of the affidavit was neither argued nor brought to the attention of this Court by the parties. Nevertheless, the Court believes it has an independent duty to ensure that the statutory requirements are met for protection of a materialman's lien.

*Milner* involves the perfection of a subcontractor's lien, in which the omission from § 53.054(a)(3) affected the ability for the general contractor "to assess the validity of the lien or determine whether it properly complied with the statutory retainage requirements." *Mustang*, 263 S.W.3d at 442 (analyzing *Milner*) (citing Prop. § 53.054(a)(3) (requiring "for a claimant other than an original contractor, a statement of each month in which the work was done")).

This suit does not involve a lien dispute between a contractor and subcontractor. Such a dispute might require more information in its "general statement" in order to determine what work was actually performed at which time. *See id.* (requiring such a determination to prove validity). The parties in this suit had actual and uncontroverted knowledge of the work and labor provided by Halgo.[29] *See id.* (noting that *Milner* simply implied that a failure to comply with § 53.054(a)(3) could "**conceivably** mislead an owner or contractor to his prejudice[.]") (emphasis added).

Halgo's affidavit sufficiently described the property to which Halgo's lien attached in light of the technical dispute surrounding the Contract and Subcontract. *See Richardson v. Mid-Cities Drywall, Inc.*, 968 S.W.2d 512, 514-15 (Tex. App.—Texarkana 1998, no pet.) (holding that when sufficiency of an affidavit is at issue, the results are fact-specific). Halgo's affidavit did not need to describe the labor provided under the Subcontract for Halgo's lien to sufficiently attach to the industrial boilers that Halgo installed.

For all of the foregoing reasons, this Court concludes that Halgo timely filed a sufficiently detailed affidavit so as to obtain a valid and properly perfected statutory materialman's lien on Boiler #1 and Boiler #2.

---

[29] Moreover, actual knowledge of the information at issue in the lien dispute is sufficient to defeat an accusation of prejudice. *Id.* Bigler paid the Subcontract (which outlined the labor to be provided) in full. [Finding of Fact No. 32]. This fact provides sufficient evidence that the timing of the labor provided is not an issue with regards to Halgo's affidavit. *See Mustang*, 263 S.W.3d at 442 (stating that misleading does not occur when the parties "had actual knowledge of the information at issue . . . and therefore would not have been misled to their prejudice by [claimants'] failure to include such information in the lien affidavits[]").

b.    *Shaw does not have a Valid Statutory Mechanic's Lien*

Pursuant to the Texas Property Code, Shaw needed to file an affidavit with the county clerk on the 15th day of the fourth calendar month after the day on which the indebtedness accrues in order to timely perfect its lien.  *See* Prop. § 53.052(a).  On March 23, 2009, Shaw completed the fabrication and installation of the process piping system.  [Finding of Fact No. 42].  Shaw did not file its affidavit until September 14, 2009 [Finding of Fact No. 43]; therefore it was not timely.  Indeed, Shaw has admitted that it filed an untimely Affidavit for Mechanic's Lien. [Finding of Fact No. 46].  Accordingly, the Court concludes that Shaw does not have a valid statutory mechanic's lien on the piping system.

2.    <u>Constitutional Liens</u>

Even if a statutory lien cannot be proven, there is an alternative avenue. A constitutional lien is self-executing and arises "independently and apart from any legislative act." *Ralph M. Parsons Co. v. S. Coast Supply Co.* (*In re A & M Operating Co.*), 182 B.R. 997, 1000 (E.D. Tex. 1995), *aff'd*, 84 F.3d 433 (5th Cir. 1996).  "[A] constitutional lien can exist even if the lien-holder fails to comply with the legislative requirements for statutory liens." *Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 830 (Tex. App.—Texarkana 1999, no pet.) (citing *Hayek v. W. Steel Co.*, 478 S.W.2d 786, 790 (Tex. 1972)).  Unlike statutory liens, which must be recorded, constitutional liens arise automatically and the lien holder is not required to give notice or record the lien.  *Id.; see also CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 240 (Tex. 2002) ("[F]or constitutional liens that are self-executing, there are no technical requirements. . . .").

A party is entitled to a constitutional lien if it: (1) qualifies as a "mechanic," an "artisan," or a "materialman;" and (2) makes or repairs an "article" or "building." Tex. Const. art.

XVI, § 37; *In re Hydro-Action, Inc.*, 2004 Bankr. LEXIS 262, at *13-14 (Bankr. E.D. Tex. Jan. 22, 2004). Article XVI, section 37 of the Texas Constitution provides:

> Mechanics, artisans and material men, of every class, shall have a lien upon the *buildings* and *articles made* or *repaired* by them for the value of their labor done thereon, or material furnished therefore; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens.

Tex. Const. art. XVI, § 37 (emphasis added).

>     *a.    Mechanic, artisan, or materialman*

A "mechanic" is "a person skilled in the practical use of tools, a workman who shapes and applies material in the building of a house or other structure mentioned in the statutes; a person who performs manual labor." *A & M Operating Co.*, 182 B.R. at 1002 (citing *Warner Mem'l Univ. v. Ritenour*, 56 S.W.2d 236, 237 (Tex. Civ. App.—Eastland 1933, writ ref'd)).

An artisan is "one skilled in some mechanical craft; one who is employed in an industry or mechanic art or trade," or "one trained for manual dexterity in some mechanic art or trade." *Id.* (citing *Warner Mem'l Univ.*, 56 S.W.2d at 237).

A materialman is "a person who does not follow the business of building or contracting to build homes for others, but who manufactures, purchases or keeps for sale materials which enter into buildings and who sells or furnishes such material without performing any work or labor installing or putting them in place." *Id.* (citing *Huddleston v. Nislar*, 72 S.W.2d 959, 962 (Tex. Civ. App.—Amarillo 1934, writ ref'd)).

The parties have stipulated that Halgo is a "materialman" but not a "mechanic" or "artisan." [Finding of Fact No. 28]. Halgo purchased materials from various manufacturers and furnished the materials to Bigler without performing any work or labor installing or putting them

in place; indeed, it was Shaw who installed the Boiler System. [Finding of Fact Nos. 27, 29, 31 & 38].

   b. *Buildings and Articles Made or Repaired*

    (i) **Buildings**

   The Texas Constitution does not define what constitutes a "building." Some courts have defined "building" as "only those structures having a capacity to contain and which are designed for the habitation of man or animals **or the shelter of property**." *Lodal & Bain Eng'rs, Inc. v. Bayfield Pub. Util. Dist.*, 583 S.W.2d 653, 655 (Tex. Civ. App.—Houston [1st Dist.] 1979), *rev'd on other grounds sub nom. Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.*, 602 S.W.2d 262 (Tex. 1980) (emphasis added) (citing *Peterson v. Stolz*, 269 S.W. 113, 116 (Tex. Civ. App.— Beaumont 1925, writ ref'd)). Other courts have held that the definition of "building" depends on "the particular facts and circumstances of each case, controlled largely by the intention of the parties, or by the aim or purpose of a particular statute . . . [and] … it has been held to include all sorts of structures, fabrics built or constructed, edifices or erections used or useful to man." *Ambrose & Co. v. Hutchison*, 356 S.W.2d 215, 216 (Tex. Civ. App.—Fort Worth 1962, no writ) (citing *Mut. Lumber Co. v. Sheppard*, 173 S.W.2d 494, 497 (Tex. Civ. App.—Austin 1943, no writ)). The term "building" is construed broadly. *See Ambrose*, 356 S.W.2d at 216 (holding that a pier is a building); *Moore v. Carey Bros. Oil Co.*, 269 S.W. 75, 76 (Tex. Comm'n App. 1925) (holding that oil well casing is a building).

   This Court concludes that the HPIB Facility is a building because it is a structure that contains and shelters property—for example, the piping system.

### (ii)    Articles

This Court looks to the usual and ordinary definition of "articles" and "made" because they are not technical terms. *Ball v. Davis*, 18 S.W.2d 1063, 1067 (Tex. 1929) (citing 6 Ruling Case Law § 47) ("The words used in the Constitution are to be given their usual and ordinary signification, unless, of course, they are technical words, or, as the rule is sometimes stated: Since the Constitution is an instrument adopted by the people generally before it has any vitality, the words employed are to be interpreted as the people generally understood them.").

The term "article" is commonly defined as a "particular object or substance, a material thing or a class of things." *Hydro-Action*, 2004 Bankr. LEXIS 262, at *17 (citing *Black's Law Dictionary* 111 (6th ed. 1990) (citing previous edition)). The Fifth Circuit held that that an oil well casing cemented in place is an "article" or "thing." *Bovaird Supply Co. v. Am. Tank Co.*, 29 F.2d 361, 362 (5th Cir. 1928).

The term "made" is defined as "produced or manufactured artificially" and "put together of various ingredients." *Hydro-Action*, 2004 Bankr. LEXIS 262, at *17 (citing *Black's Law Dictionary* 950 (6th ed. 1990); *Webster's New Collegiate Dictionary* 683 (1979)).

A few courts have defined "articles made." The District Court for the Eastern District of Texas has articulated a broad definition:

> [A] century of jurisprudence can be distilled as follows: a materialman is entitled to a constitutional lien if it can prove that: (1) the debtor is the owner of a building or article; (2) the materialman had privity of contract with the debtor; (3) the materialman **made** or repaired the building or **article** by (a) supplying goods and constructing all or part of the building or article, (b) supplying goods and repairing the building or article, (c) supplying unique goods manufactured in accordance with the debtor's specifications, or (d) furnishing off-the-shelf general inventory goods with the intent of both the materialman and debtor that such goods be incorporated into specified buildings or articles; (4) the materialman actually supplied those goods to the debtor; and (5) the goods were incorporated into the building or article.

*A & M Operating Co.*, 182 B.R. at 1004 (emphasis added).[30]

In *Ball*, the Texas Supreme Court, in rejecting a constitutional lien asserted by two men installing well casings, adopted a restrictive interpretation of "articles made." The court held that the mere connection of pre-manufactured articles did not constitute "making" an article. *Ball*, 18 S.W.2d at 1067. While the court recognized that the well casings were "articles," it held that connecting the well casings did not create an "article made." *Id.* ("Screwing the joints of casing together as a part of the process of placing them in an oil well for use is simply using the casing in the manner and way it is made to be used. It is not making anything, but using a thing already made in the ordinary and usual manner, and in fact in the only way it can be used.").

Applying the Texas Supreme Court's interpretation of "articles made," the court in *Boots Builders* held that the defendant who supplied labor and materials to install an air conditioning system did not have a valid constitutional lien because the air conditioning system was not an "article made." *Boots Builders, Inc. v. Hobson Air Conditioning, Inc.* (*In re Boots Builders, Inc.*), 11 B.R. 635, 637, 641 (Bankr. N.D. Tex. 1981). In *Boots*, the defendant also installed the air conditioning system—connecting the various components and electrical connections. *Id.*

The Texas Supreme Court has held that the "constitutional lien attaches to buildings and *special-order* articles that are made or repaired by mechanics, material men, and artisans who have a direct contractual relationship with the owner of the property." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741-42 (Tex. 2005) (emphasis added); *Whirlpool Corp.*, 517 S.W.2d at 268 (holding that "the constitutional lien on manufactured chattels is available . . . only upon

---

[30] While the Fifth Circuit affirmed the district court's decision, it determined that the opinion is not binding precedent pursuant to Local Rule 47.5.4 of the Fifth Circuit. Moreover, this Court is not bound by the decisions from the District Court of the Eastern District of Texas. *See In re MPF Holding U.S. LLC*, 443 B.R. 735, 753 (Bankr. S.D. Tex. 2011) (noting that a bankruptcy court in the Southern District of Texas is bound only by a decision of the district court sitting in the Southern District of Texas). Thus, this Court will apply the Texas Supreme Court's interpretation of "articles made" instead of the interpretation given to the phrase by the district court in *A & M Operating*. *A & M Operating Co.*, 182 B.R. at 1004. The specific Supreme Court of Texas opinions on which this Court relies are *Ball* and *In re Kellogg Brown & Root*, 166 S.W.3d 732 (Tex. 2005).

articles made especially for a purchaser pursuant to a special order and in accordance with the purchaser's plans or specifications[]").

      *c.*    *Halgo does not have a Valid Constitutional Materialsman's Lien*

    Halgo would be entitled to a constitutional lien if it made or repaired an "article" or "building." *See* Tex. Const. art. XIV, § 37. This Court concludes that Halgo did not make or repair either the HPIB Facility or the Boiler System.

### (i)    Halgo did not make or repair the HPIB Facility

    Although the HPIB Facility is a building, this Court concludes that Halgo did not make or repair the HPIB Facility. The extent of Halgo's work under the Contract and Subcontract was to provide and furnish two boiler units and related equipment and to provide start-up and commissioning of Boiler #1. [Finding of Fact Nos. 25, 26, 32 & 33]. Halgo and Bigler simply did not contract for Halgo to construct the HPIB Facility or repair the building itself.

### (ii)    The Boiler System constitutes an "article"

    This Court concludes that the entire Boiler System that Halgo provided is comprised of "articles" because they are particular objects or a class of things. *See Hydro-Action*, 2004 Bankr. LEXIS 262, at *17.

### (iii)    Halgo did not make or repair the Boiler System

    Although the Boiler System is comprised of "articles," Halgo did not repair the Boiler System nor did Halgo "make" the articles which comprise the Boiler System. Rather, Halgo purchased the equipment from different manufacturers. [Finding of Fact Nos. 27 & 29]. Halgo is considered an equipment packager integrator, which means that it sizes and packages the boiler units to meet the customer's system demands. [Finding of Fact No. 27].

In *Boots*, the contractor was not entitled to a constitutional lien, even though the contractor supplied materials **and** installed an air conditioning system. *Boots*, 11 B.R. at 637, 641. The Boiler System is similar to an air conditioning system—both require materials and installation. However, if furnishing **and** installing a system can be found insufficient to constitute "make or repair" an article, then Halgo's sole act of furnishing the materials for the Boiler System is also insufficient. *See id.* Although Halgo bought all of the pieces from various companies, Shaw installed and put the parts together to make it whole. [Finding of Fact Nos. 27, 31 & 38]. Even if Halgo had put the parts together, the Court in *Ball* held that merely connecting completely manufactured articles is not "making" a final article. *See Ball*, 18 S.W.2d at 1067.

### (iv)    The Boiler Units are not "Special-order" Articles

Halgo contracted directly with Bigler to supply the boiler units to the HPIB Facility. [Finding of Fact No. 25]. Even if this Court is incorrect and the Boiler System is comprised of "articles made," Halgo would not be entitled to a constitutional lien because none of the "articles made" were special-order articles. While Bigler "ultimately told Halgo what they wanted in the boilers," Bigler was not sure what type of boilers it needed at the beginning; Halgo helped Bigler determine the capacity requirements and the types of fuels needed. [Finding of Fact No. 29]. The fact that Halgo had to assist Bigler in determining what type of boilers Bigler needed underscores this Court's conclusion that the boilers were not special-order boilers; this Court is of the view that for the boilers to be special-order articles, Bigler would have had to provide Halgo with definite specifications of exactly the type of boilers that it wanted. Moreover, Freeman testified that both of Halgo's boilers can be easily sold as either new or used. [Finding of Fact No. 57]. Although the package boilers that Halgo sells are "built for the specific operating parameters of the customer" [Finding of Fact No. 27], the boilers can be *easily* re-used

by another company. [*See* Finding of Fact No. 58]. Thus, this Court concludes that the boilers must not have been made especially for Bigler pursuant to a special order and in accordance with Halgo's plans or specifications.

Based on the aforementioned reasons, this Court concludes that Halgo is not entitled to a constitutional lien.

> d.     *Shaw has a valid constitutional mechanic's lien*

The parties stipulated that Shaw is a "mechanic" or "artisan." [Finding of Fact No. 47]. The parties also stipulated that Shaw is entitled to a constitutional lien on the process piping system that it fabricated and installed at the HPIB Facility. [Finding of Fact No. 48]. Therefore, unlike Halgo, Shaw has a valid constitutional lien.

## C.     Removables and Priority of Liens

A mechanic's and materialman's lien "is superior to a prior recorded deed of trust lien if the materials furnished can be removed without material injury to (i) the land, (ii) the pre-existing improvements, or (iii) the materials themselves." *Exch. Sav. & Loan Ass'n v. Monocrete Pty. Ltd.*, 629 S.W.2d 34, 36 (Tex. 1982) (citing *Whirlpool Corp*, 517 S.W.2d at 269).  Under the "*Whirlpool* Material Injury" test, a court may consider the following factors: "(1) the nature and function of the item sought to be removed; (2) the probability of damage to the structure without the item; (3) the manner and extent of attachment to the land or existing structure; (4) the extent to which removal would necessitate repairs, modification and/or protection of the land or existing structure; and (5) the stage of completion of improvements under construction at the time removal is sought." *Cornerstone Bank, N.A. v. J.N. Kent Constr. Co.,* No. 05-91-00499-CV 1992 WL 86591, at *2 (Tex. App.—Dallas Apr. 17, 1992, no writ) (citing *Monocrete*, 629 S.W.2d at 36–37).

Even if the mechanic's lienholder or the materialman's lienholder shows that the removal of its improvements would not materially injure the land, the improvements, and the materials to be removed, the court must next determine whether the items are "separable from the basic structure"—specifically, the improvement "should not be an 'integral part of the basic structure.'" *Id.* (quoting *Monocrete*, 629 S.W.2d at 37); *see Jordan & Nobles Constr. Co. of El Paso v. Orah Wall Fin. Corp. (In re Orah Wall Fin. Corp.)*, 84 B.R. 442, 445 (Bankr. W.D. Tex. 1986). Under the "*Monocrete* Incorporation" test, the following factors should be considered in determining whether an improvement is separable:

> (1) Is the item merely attached to the structure in such a manner that it is obvious that removal and/or replacement is always possible?
>
> (2) Is the item one which is removed and/or replaced as part of ordinary maintenance?
>
> (3) Is the item one which is removed and/or replaced as part of the ordinary operation of the building?
>
> (4) Is removal, while not usual, or even usually contemplated, so simple and so nondestructive of item, structure or freehold, that to deny removability (or separateness) would violate the purpose of the mechanic's lien statutes?
>
> (5) Is the item, though easily removable, such a part of the finished structure that no party would ever contemplate removal and/or replacement during the ordinary operation and maintenance of the building?

*Wall*, 84 B.R. at 446.

In the suit at bar, Shaw asserts that the process piping system is removable, while Halgo contends that the Boiler System is removable. Not surprisingly, Amegy argues that neither are removable. For the reasons set for below, this Court finds that: (1) Shaw's piping system is **not** removable; (2) Halgo's Boiler System is **not** removable; and (3) Boilers #1 and Boiler #2 **are** removable.

1.      Shaw's Process Piping System is not Removable

While removal of the piping system would not materially injure the land [Finding of Fact No. 77], the pipes themselves, or the instruments attached to the pipes, removal *would* materially damage the pre-existing improvements at the HPIB Facility. [Finding of Fact Nos. 70, 72, 74, 76 & 78]. Specifically, the insulation, the primer and paint covering a portion of the pipes, as well as the bolts and gaskets, would all be materially damaged upon Shaw's removal of the piping system. [Finding of Fact Nos. 70, 72 & 78].  While the Court finds that some of the pre-existing improvements—insulation blankets and various instruments attached to the pipes—are removable, they are part of the assembled piping system, and removal of the system would materially injure other pre-existing improvements at the HPIB Facility.

a.      *Removable Instruments*

(i)      **Detachable Insulation Blankets**

Portions of Shaw's process piping system are covered with detachable insulation blankets.  [Finding of Fact Nos. 67 & 68]. The blankets are merely attached and can be simply removed by unstrapping them and setting them aside. [Finding of Fact No. 68].   When instruments "are so easy to remove, it is difficult to find 'incorporation' (*Monocrete*)." *Wall*, 84 B.R. at 447. Because removal of the blankets would not cause any material damage and are easily removable, the Court concludes that both the *Whirlpool* Material Injury test and the *Monocrete* Incorporation test allow removal.

(ii)      **Instruments and Remaining Equipment Attached to the Pipes**

There are various instruments and gauges attached to the process piping system that would need to be removed if Shaw were to remove its pipes.  [*See* Finding of Fact No. 76].  At trial, the testimony indicated that removing the pipes would expose the instruments and any

remaining equipment—including the remaining pipes and valves—to the environment. [*See* Finding of Fact No. 66]. The Court does not, however, find persuasive Amegy's arguments that the instruments or remaining equipment are at risk of exposure to elements. Removal of the instruments and the remaining equipment does not violate the *Whirlpool* Material Injury test. [*See* Finding of Fact No. 66]. Nor does the Court conclude that the *Monocrete* Incorporation test demands consideration of the risk of exposure to elements. *Id.* at 447 (holding that removal of exterior doors would not violate the *Monocrete* Incorporation test because "[i]njury to the structure exists (i.e. exposure to the elements), but removal of any item may result in this problem . . . *Monocrete* would apparently have allowed this type of injury."). Since the instruments and remaining equipment attached to the pipes are not "integral," this Court concludes that both tests allow removal.

> b.      *Non-Removable Improvements*

> (i)      **Insulation**

Shaw neither supplied nor installed the insulation covering approximately forty percent of its process piping system. [Finding of Fact Nos. 41 & 67]. In order to remove the insulation covering Shaw's process piping system, Shaw would need to cut the metal bands securing the insulation and set aside the metallic jackets covering the insulation; only then could the insulation could be peeled off of the pipes. [Finding of Fact No. 69]. While removal of the insulation is simple, it would damage the insulation and render it unusable. [Finding of Fact No. 69]. This would violate the *Whirlpool* Material Injury test. In sum, the Court concludes that the insulation is a pre-existing improvement, removal of the process piping system is not possible without material damage to the insulation.

### (ii)     Primer and Paint

Shaw did not supply the primer and paint which now rests on its process piping system, nor did it apply the primer and paint.  [Finding of Fact Nos. 41 & 70].  Shaw is not entitled to the paint, and  it cannot separate the paint from pipes—the paint has become an integral part of the pipes.  [Finding of Fact No. 70].  Indeed, the court in *Quinn v. Dickinson* found that the paint and wallpaper supplied by the materialman could not be detached "without materially injuring the property." 146 S.W. 993, 1000 (Tex. Civ. App.—Amarillo 1912, no writ).  Similarly, Shaw will materially damage the paint should Shaw try to remove the pipes; the damage therefore prohibits removal of the piping system.

### (iii)     Bolts

There are approximately 2,700 bolts securing the process piping system.  [Finding of Fact No. 71].  Shaw will need to unbolt the flanges securing the pipes and equipment to dismantle the piping system, and while the bolts themselves may not break or suffer visible damage, it is the industry standard not to re-use previously tightened bolts due to unknown stress the bolts may undergo when removed.  [Finding of Fact No. 72].  As such, although the bolts could be removed, the potential and unknown stress to the bolts upon removal leads this Court to conclude that the bolts will suffer material damage upon removal of the process piping system.

### (iv)     Gaskets

Shaw will need to break the sealed, flanged connections in order to dismantle the piping system into manageable-sized pipe spools.  [Finding of Fact No. 64].  Once the flanged connections are broken, the compressed gaskets are damaged and not reusable.  [Finding of Fact No. 74].  While the average cost of each gasket is relatively *de minimus*, and the flanged

connections are designed to be broken in the course of repairs, the gaskets will be materially damaged upon removal of the process piping system. [Finding of Fact Nos. 73, 74 & 75].

      *c.*    *Integrated Process Piping System*

Upon removal of the process piping system, the insulation, primer and paint, bolts, and gaskets discussed above would all be materially damaged. This indicates that the process piping system is not removable, as all of these materials are part of the assembled system. Such removal would thus violate the *Whirlpool* Material Injury test. *See Wall*, 84 B.R. at 446.

The piping system is segregated from the main HPIB Facility in the OSBL such that removal would be possible.[31] *See* [Finding of Fact No. 40]. However, the process piping system, which is the subject of Shaw's mechanic's lien, is not designed to be removed or replaced in the ordinary course of maintenance. [Finding of Fact No. 63]. Nor is removal of the process piping system "easy" and "so non-destructive" of the items "that to deny removability (or separateness) would violate" public policy. *Wall*, 84 B.R. at 446. While this Court recognizes that certain sections, or spools, of piping may be periodically removed and replaced as part of system repairs, the spools make up a complete process piping system—a system that is not ordinarily replaced and cannot be removed without material damage to the pre-existing improvements and materials that comprise the assembled process piping system. [Finding of Fact No. 63].

The court in *Wall* came to a similar conclusion in evaluating the removability of a suspended ceiling. *See Wall*, 84 B.R. at 447-48. The court found that while the ceiling— namely, the grid, acoustical panels, and insulation—would not be materially damaged upon

---

[31] This removal would cause little damage to the pipes themselves—at most, fifteen feet of pipe loss. [Finding of Fact No. 65]. The slight loss in pipe, however, is not the determinative factor. The pre-existing improvements, such as the paint and insulation, as well as the gaskets and bolts, would all be damaged upon removal. Therefore, although the pipes themselves would not suffer material damage, this fact is not determinative. What counts is the damage to the paint, insulation, bolts, and gaskets.

removal, the removal failed the *Monocrete* Incorporation test, in part because although the panels were ordinarily replacement items, the entire paneling system was not. *See id.* at 448.

Similarly, in this suit, although certain pipe spools within the piping system may be replaced periodically, the system as a whole was never intended to be replaced as part of ordinary operations. [Finding of Fact No. 63]. Indeed, the photographs of the HPIB Facility portray an intricate, interconnected system of piping not easily removable and not ordinarily replaced. [Amegy Exs. 32, 36 & 51; Shaw Ex. 46]. Removal of even one pipe spool, let alone the entire process piping system, would result in a shutdown of the HPIB Facility and a loss in production. [Finding of Fact No. 78]. Of course, this is not something a company in the business of turning a profit would engage in on a routine basis unless absolutely necessary.

In sum, the process piping system that Shaw fabricated and installed cannot be removed without material damage to the pre-existing improvements discussed above. The pipes function as a complete system, removal of which would be neither easy nor ordinary. [Finding of Fact No. 63]. Removal of the piping system would violate both the *Whirlpool* Material Injury test and the *Monocrete* Incorporation test. Although Shaw has a valid constitutional lien on the piping system, this Court nevertheless concludes that the piping system itself is not removable; therefore, Shaw's lien on the piping system is not superior to Amegy's liens on this system.

2.    Halgo's Boilers are Removable

This Court concludes that the boiler units themselves are removable, but the remaining equipment, such as the duct-work, deaerator, economizers, and stacks are not removable.[32]

---

[32] This Court has already held that Halgo does not have a valid statutory lien on the Boiler System—i.e. on both the boilers **and** the related equipment. [*See* Footnote No. 25]. Further, this Court has already held that Halgo does have a valid statutory lien on Boiler #1 and Boiler #2. Therefore, the Court could focus solely on whether Boilers #1 and #2 are removable and not even discuss if the related equipment is removable. However, out of an abundance of caution, in the event this ruling is ever on appeal, the Court will discuss the reasons that it believes the related equipment, even if Halgo did have a valid statutory lien thereon, is nevertheless not removable.

a.      *Halgo's Boiler #1 and Boiler #2 are Removable*

Halgo's Boiler #1 and Boiler #2 arrived at the Bigler HPIB Facility by railcar and were lifted into place by crane onto the concrete pads. [Finding of Fact No. 30]. Indeed, the units have permanent metal rungs attached to the top of the units in contemplation of removal or replacement. [Finding of Fact No. 54]. The design and installation of the boiler units alone suggest to this Court that the units are not integral to the HPIB Facility and are therefore removable. Further, the fact that it is not uncommon for Halgo to rent boiler units is highly suggestive of their removable nature. [Finding of Fact No. 58].

The boiler units are similar to an air conditioning unit, which courts have previously found to be removable. For example, in *Cornerstone Bank*, the court found that air conditioning compressors installed on a roof were removable because "they could be removed by unscrewing them from their bases and disconnecting them from the electrical and refrigerant lines. 1992 WL 86591, at *3.[33] The only modification to the building necessitated by removing the compressors would be capping the two or three holes where the refrigerant lines enter the building." *Id.; see also Am. Amicable Life Ins. Co. v. Jay's Air Conditioning & Heating, Inc.*, 535 S.W.2d 23, 25 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.) (holding that the air-handling units and compressors inside the air conditioning units were removable); *Houk Air Conditioning, Inc. v. Mortg. & Trust, Inc.*, 517 S.W.2d 593, 595 (Tex. Civ. App.—Waco 1974, no writ) (holding that heating and air conditioning systems are removable).

In this suit, Halgo's disconnection of Boiler #1 and Boiler #2 would entail a process similar to that of the air conditioning units. There are several pipes that would need to be detached and capped, as well as some electrical wiring. [Finding of Fact Nos. 53 & 55]. The

---

[33] One of Shaw's witnesses, upon examination by Halgo's attorney, credibly testified that the boiler units on which Halgo has a lien are similar to an air conditioning compressor. [July 1, 2011 Tr. 149:17–20, Marcus Deal].

bolts securing the units to the concrete pad would also need to be undone, but the disconnection is not complex, and removal would not materially damage the units themselves. [Finding of Fact No. 53]. Thus, even if the boiler units are not ordinarily removed, they are relatively easy to remove without injury such "that the *Monocrete* and material injury test do not affect the rights of the mechanic." *Wall*, 84 B.R. at 447.

Moreover, the potential environmental damage to the remaining improvements as a result of the removal of the boilers is irrelevant because it is not a consideration under the *Monocrete* test. *See id.*; *Cornerstone Bank*, 1992 WL 86591, at *4 ("The only modification of the building necessitated by the removal of the doors would be the covering of the entrances to the building with plywood sheets or other material to protect the interior from the elements."). Therefore, although Halgo may need to cap some of the remaining pipes upon removal of the boiler units [Finding of Fact No. 55], this capping is not fatal to Halgo's claim that the boilers are removable. Additionally, the fact that disconnecting the boilers might cause minor damage to the pre-existing improvements attached to the units—such as damage to the gaskets where the flanged connections are broken and damage to the bolts [Finding of Fact No. 60]—is not fatal to Halgo's claim of removal. *See Wall*, 84 B.R. at 447 (noting that even though the evidence showed there might be "minor damage to wall paper" upon removal of the cabinets, "[s]uch [was] not 'material injury'"). This damage is simply not material. For these reasons, this Court concludes that Boiler #1 and Boiler #2 are removable.

Alternatively, this Court concludes that even if Boiler #1 is not removable because it is presently used in the operation of the HPIB Facility [Finding of Fact No. 57]—and is therefore incorporated into the Facility—nevertheless Boiler #2 has never been used. [Finding of Fact No.

57].  As such, this Court concludes that Boiler #2 could not possibly be considered to be incorporated into the Facility, and therefore constitutes a removable.

b.    *Halgo's Remaining Equipment is Not Removable*

This Court has already held that Halgo does not have a valid lien on the remaining equipment because Halgo's affidavit did not reference this equipment, but only referenced the two boilers.  [*See* Finding of Fact No. 36].  However, even if this Court is incorrect, and Halgo does have a valid lien on the remaining equipment, this Court would still hold that this lien is not superior to Amegy's liens because the equipment is not removable.

Removal of the auxiliary equipment that Halgo supplied to the HPIB Facility would materially damage the pre-existing improvements.  The auxiliary equipment is attached to the structure either by anchor bolts and grout at the concrete foundations or by bolts attached to an elevated steel support structure.  [Finding of Fact No. 56].  The insulation covering some of the auxiliary equipment was not supplied by Halgo. [Finding of Fact No. 52].  In order to remove the duct-work, the deaerator, the outlet steam piping, and other auxiliary equipment, Halgo would need to disassemble the metal jacketing to remove the insulation, disassemble tubing and piping, break grouted surfaces, and unbolt the items. [Finding of Fact No. 56].

Removal of the auxiliary equipment would damage the insulation and metal jacketing, rendering it unusable [Finding of Fact No. 56], which clearly violates the *Whirlpool* Material Injury test.  The insulation is a pre-existing improvement; removal of the auxiliary equipment is not possible without material injury to the insulation.  Hence, this Court concludes that the two industrial boiler units Halgo supplied for the HPIB Facility—i.e. Boiler #1 and Boiler #2—are removable, but the remaining equipment is not.  As such, Halgo's statutory lien is superior to Amegy's liens with respect to Halgo's lien on Boiler #1 and Boiler #2, and Halgo is therefore

53

entitled to the cash value of its collateral, as defined by the Plan.  [Finding of Fact Nos. 14, 15, 16 & 17].

**D.      Value of Halgo's Boiler Units**

Halgo is owed the principal balance of $533,472.45.  [Finding of Fact Nos. 34 & 35]. Boiler #1 and Boiler #2 are valued at $2,000,000.00, collectively.  [Finding of Fact No. 61].

Under Texas law, contracts "should be interpreted so as to avoid meanings that produce unreasonable, oppressive, or absurd results in favor of meanings that render the operation of the contract fair and reasonable." *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.,* 762 F.2d 1239, 1245 (5th Cir. 1985). *See also Dore Energy Corp. v. Prospective Inv. & Trading Co. Ltd.*, 570 F.3d 219, 225 (5th Cir. 2009) (holding that a contract should not interpreted in a way that leads to "unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit[]") (citing *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998)); *S. Cnty. Mut. Ins. v. Sur. Bank, N.A.*, 270 S.W.3d 684, 689 (Tex. App.—Fort Worth 2008, no pet.) (declining to construe contracts to "produce an absurd result when a reasonable alternative construction exists[]"). The Plan is a contract, and the provisions of the Plan govern how much Halgo is to be paid. *In re Nat'l Gypsum Co.*, 257 B.R. 184, 203 (Bankr. N.D. Tex. 2000); *In re E-H Farms*, 238 B.R. 661, 663 (Bankr. N.D. Tex. 1999).

Article 3.3 in the Plan provides that "[E]ach holder of an Allowed Removables Claim shall receive . . . payment in Cash by Amegy equal to the *value of the Collateral* securing its Lien, as determined by the Bankruptcy Court in M&M Lien Priority Adversary . . . ." [Finding of Fact No. 14] (emphasis added).

The Plan explicitly states that Halgo is entitled to the "value of the Collateral" securing its lien. [Finding of Fact No. 14]. Because the value of Halgo's collateral is $2,000,000.00.

[Finding of Fact No. 61], the plain meaning of the applicable Plan provision is that Amegy must pay Halgo the sum of $2,000,000.00. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' In such cases, the intention of the drafters, rather than the strict language, controls.") (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982). However, this Court concludes that it would be unreasonable to award Halgo $2,000,000.00 when the balance owed under the Contract is $533,472.45. [Finding of Fact No. 34 & 35]. Doing so would constitute a windfall for Halgo; indeed, under Texas foreclosure law, no creditor who forecloses is entitled to any proceeds in excess of what is necessary to pay off the debt, but rather any excess proceeds are remitted to the debtor. *See In re Home and Hearth Plano Parkway*, 320 B.R.596, 604 (Bankr. N.D. Tex. 2004); *See also Gill Sav. Ass'n v. Int'l Supply Co., Inc.*, 759 S.W.2d 697, 702 (Tex. App.—Dallas 1988 writ denied) (". . .[A] mechanic's lien claimant is allowed to 'recover the entire amount of his debt up to the total value of the removable improvements.'") (citing *L & N Consultants, Inc. v. Sikes*, 648 S.W.2d 368, 370-71 (Tex. App.— Dallas 1983, writ ref'd n.r.e.)). Accordingly, this Court concludes that Halgo is entitled to receive payment in cash totaling $533,472.45, plus attorneys' fees as discussed below.

Finally, in the alternative, if this Court is incorrect that both Boiler #1 and Boiler #2 are removable, this Court has nevertheless concluded that Boiler #2 is a removable because has never been used and therefore cannot be considered to be incorporated into the Facility. This Court has found that Boiler #2 has a value of at least $650,000.00. [Finding of Fact No. 61, Footnote No. 16]. Thus, even if Halgo's lien is superior to Amegy's lien on only Boiler #2, Halgo is still entitled to receive payment in cash totaling $533,472.45, plus attorneys' fees.

Indeed, under the plain reading of the Plan, Halgo is entitled to receive cash equal to the value of

its Collateral, which means that Halgo would entitled to receive $650,000.00 from Amegy.

However, as already discussed above, this Court concludes that it would be unreasonable to

award Halgo any amount in excess of $533,472.45, plus attorneys' fees.[34]

## E.     Attorneys' Fees[35]

Under Texas law, attorneys' fees may not be recovered unless provided by statute or by

contract between the parties. *Dall. Cent. Appraisal Dist. V. Seven Inv. Co.*, 835 S.W.2d 75, 77

(Tex. 1992); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex.

App.—Dallas 2009, no pet.).[36] In the dispute at bar, therefore, the attorneys' fees incurred by

Halgo can be awarded if there is a provision in the Contract or there is a statutory provision

under the Texas Property Code (which governs mechanics' and materialmen's liens, and the

corresponding rights that accompany those liens).   The Contract between Bigler and Halgo

contains no express provision regarding recovery of attorneys' fees. Moreover, to the extent that

---

[34] The difference between $650,000.00 and $533,472.45 is $116,527.55. The Court will be surprised if Halgo's attorneys' fees exceed $116,527.55, but if they do, then the Court will not award any fees in excess of $116,527.55. This is so because there is no question that the ceiling for the amount that Amegy must pay to Halgo under Article 3.3 of the Plan is "Cash . . . equal to the value of the Collateral . . . ."

[35] This Court is aware that under § 506(b) of the Bankruptcy Code, an oversecured creditor is entitled to recover attorneys' fees if the charges are: (i) provided for under the agreement or State statute under which such claim arose; and (ii) reasonable. 11 U.S.C. § 506(b) (2006); *Ryker v. Current*, 338 B.R. 642, 648 (D.N.J. 2006) *aff'd sub nom. In re Ryker*, 06-1872, 2007 WL 2138590 (3d Cir. July 27, 2007). It is undisputed that Halgo is an oversecured creditor because the value of its collateral ($2,000,000.00) exceeds the amount owed to it under the Contact ($533,472.45). Thus, Halgo would be entitled to attorneys' fees under § 506(b) if the Texas statute "under which the claim itself arose provides for recovery of fees." *See* 11 U.S.C. § 506(b); *In re Astle*, 364 B.R. 735, 741 (Bankr. D. Idaho 2007). Indeed, Halgo's proof of claim even sets forth that Halgo is entitled to recover its attorneys' fees under § 506. [Finding of Fact No. 5]. However, the Plan failed to expressly provide that § 506(b) would govern whether Halgo would be entitled to recover its attorneys' fees. Because § 506 (b) governs whether a creditor may recover its fees and expenses between the date of the filing of the bankruptcy petition and the date of confirmation [*See Padilla v. Wells Fargo Home Mortg., Inc. (In re Padilla)*, 379 B.R. 643, 654 (Bankr. S.D. Tex. 2007)], and because the Plan did not expressly set forth that § 506(b) would be the basis for determining whether Halgo would be entitled to its fees if it prevailed in the M&M Lien Priority Adversary, this Court will therefore evaluate whether Halgo is entitled to recovery its attorney's fees by applying **solely** Texas law.

[36] Halgo did not request its costs; it only requests its attorneys' fees. Therefore, the Court will only award attorneys' fees.

the Plan is a contract between Halgo and Amegy—which it clearly is [*In re Nat'l Gypsum Co.*, 257 B.R. 184, 203 (Bankr. N.D. Tex. 2000); *In re E-H Farms*, 238 B.R. 661, 663 (Bankr. N.D. Tex. 1999)]—the Plan is silent on whether fees and expenses can be awarded. Specifically, Article 3.3 of the Plan does not expressly state that attorneys' fees are to be awarded if Halgo prevails [Finding of Fact No. 14]; it says only that "[E]ach holder of an Allowed Removables Claim shall receive . . . payment in Cash by Amegy equal to the value of the Collateral securing its Lien, as determined by the Bankruptcy Court in [the] M&M Lien Priority Adversary . . . ." Thus, whether Halgo can recover its fees for enforcing its materialman's lien is determined by whether there is a specific statute in the Texas Property Code, or some other statute enacted by the Texas legislature. The Court concludes that there are such statutes; and thus, Halgo is entitled to reimbursement for reasonable attorneys' fees.[37]

1.      The Texas Property Code Allows Halgo to Recover its Attorneys' Fees

Pursuant to § 53.156 of the Texas Property Code, in any action to foreclose a lien or to declare any lien or claim invalid, the court is authorized, in its discretion, to award costs and reasonable attorneys' fees as "are equitable and just." Prop. § 53.156; *Wesco Distrib., Inc. v. Westport Grp., Inc.*, 150 S.W.3d 553, 558-59 (Tex. App.—Austin 2004, no pet.); Tex. Jur. 3d, Mechanics Liens § 117. A plain reading of this statute allows this Court, in its discretion, to award attorney's fees to Halgo. *See Perry & Perry Builders, Inc. v. Galvan*, No. 03-02-00091-CV, 2003 WL 21705248, *10 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op.) (citing *Tex.*

---

[37] Absent a mandatory statute, a trial court's jurisdiction to render a judgment for attorneys' fees must be invoked by pleadings. *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App.—Dallas 2009, no pet.). In the suit at bar, the applicable provision under the Texas Property Code is not a mandatory statute, but rather sets forth that the Court has discretion to award fees and costs. Prop. § 53.156. Thus, Halgo had to plead for attorneys' fees in order to have any chance of recovering such fees and costs. Fortunately for Halgo, it did in fact plead for attorneys' fees in it answer to Amegy's complaint. [Adv. Docket No. 54].

*Constr. Assoc., Inc. v. Balli,* 558 S.W.2d 513, 522 (Tex. Civ. App.—Corpus Christi 1977, no writ)).

However, a different section of the Texas Property Code calls into question whether this Court may award any attorneys' fees to Halgo. Specifically, § 53.023 of the Texas Property Code expressly sets forth the types of obligations that are secured by a lien. The first category described by § 53.023 does indeed include "material furnished"—which certainly includes such items as Boiler #1 and Boiler #2. *See* Prop. § 53.023. Importantly, § 52.023 makes no reference to attorney's fees and costs as part of the obligations that are secured by a materialman's lien. Prop. § 53.023. Therefore, inferentially, it is not unreasonable to conclude that the Texas Property Code prohibits holders of materialmen's liens from recovering attorneys' fees and costs.

Indeed, the court in *Palomita, Inc. v. Medley* concluded that when reading § 53.023 together with § 53.156, "[h]ad the legislature intended the lien to secure payment for attorney's fees and court costs, it logically should have added these to § 53.023 . . . ." 747 S.W.2d 575, 577-78 (Tex. App.—Corpus Christi 1988, no writ) (interpreting a prior version of Section 53.156); *see also McCord Constr., Inc. v. Metal Sales Mfg. Corp.*, No. 13-05-338-CV, 2006 WL 2507444, at *2 (Tex. App.—Corpus Christi Aug. 31, 2006, no pet.) (mem. op.) (noting that the "statutory mechanic's lien was not intended by the legislature to be used to secure payment for attorney's fees . . . ."); *Dossman v. Nat'l Loan Investors, L.P.*, 845 S.W.2d 384, 387 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (noting that the 1989 amendments to § 53.156 do "not purport to extend the lien to the attorney's fees, but merely restates that the court *may* award attorney's fees.") (emphasis added); *Imp. Sys. Int'l, Inc. v. Hous. Cent. Indus.*, 752 F. Supp. 745, 748 (S.D. Tex. 1990) (noting that despite amendments to the Texas Property Code, those

"amendment[s] in no way changes the *Palomita* court's holding that the attorney's fees are not secured by a mechanic's lien[]'").

This Court disagrees with *Palomita* and its progeny. And, because this Court is not bound by the holdings in these cases[38], this Court rejects the holdings for the reasons set forth herein. Section 53.156 is a very specific statute, whereas § 53.023, while specific, is not as specific as § 53.156. Section 311.026 of the Texas Government Code states, "If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail." Tex. Gov't Code Ann § 311.026(b) (West 2010). Moreover, several Texas courts have held that a specific statute governs over a general statute, regardless of the order in which the statutes were enacted. *Powell v. State*, 632 S.W. 2d 842, 844 (Tex. App.—Houston [14th Dist.] 1982, no writ); *Cuellar v. State*, 521 S.W.2d 277, 279 (Tex. Crim. App. 1975). The principle behind the general rule—that general statutes are limited or controlled by specific statutes—is that a specific statute "more clearly evidences the intention of the Legislature." *City of W. Lake Hills v. Westwood Legal Def. Fund*, 598 S.W.2d 682, 682 (Tex. Civ. App.—Waco 1980, no writ). Accordingly, because § 53.156 is more specific than § 53.023, this Court concludes that it does have discretion to award attorneys' fees to Halgo because the suit at bar: (i) is governed by § 53.156; and (ii) has been an action whereby Amegy has attempted to convince this Court that Halgo has no valid lien in the first instance, or, even if it does, Halgo's lien is inferior to the lien of Amegy.[39]

---

[38] *See Packard v. OCA, Inc.*, 624 F.3d 726, 729 (5th Cir. 2010) (noting that when determining questions of Texas law, a federal court is bound by decisions of the Texas Supreme Court; however, the "decisions of Texas intermediate appellate courts may provide guidance, but are not controlling.") (citing *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565 (5th Cir.2005)).

[39] This Court takes notice of the amended Prop. § 53.156, which was passed by the Texas legislature in its most recent session and goes into effect on September 1, 2011 and amends as follows: "[i]n any proceeding to foreclose a

Moreover, several Texas courts have expressly awarded attorneys' fees and costs to mechanic's lienholders despite the existence of § 53.023. *See e.g. Roland v. Gen. Brick Sales, Inc.*, 818 S.W.2d 896, 897 (Tex. App.—Fort Worth 1991, no writ); *Gill Sav. Ass'n v. Int'l Supply,* 759 S.W.2d 697, 702 (Tex. App.—Dallas 1988, writ denied). Stated differently, there are some courts that have simply awarded attorneys' fees and costs to mechanic's lienholders despite the existence of § 53.023. *But see Efficient Energy Sys., Inc. v. J. Hoyt Kniveton, Inc.*, 631 S.W.2d 538, 540 (Tex. App.—El Paso 1982, no writ); *Brooks v. Erbar*, 186 S.W.2d 372, 376-77 (Tex. Civ. App. 1945, writ ref'd w.o.m.); *Garza v. Hammond*, 39 S.W. 610, 611 (Tex. Civ. App. 1897 writ ref'd).

Even if this Court is bound by *Palomita* and its progeny, the *Palomita* holding regarding § 53.023 can still be harmonized with the language of § 53.156 so as to award attorneys' fees and costs— at least in instances such as the one before this Court. This is so because § 53.156 of the Texas Property Code clearly provides for collection costs and attorneys' fees for the pursuit of a lien foreclosure as long as they are not paid from the proceeds of the lien foreclosure itself. *Dossman*, 845 S.W.2d at 87. Indeed, even those courts that have expressly stated that the Texas legislature did not intend for a lien to secure attorneys' fees and costs agree that fees can be paid if they are not paid from the lien foreclosure itself. *Dossman*, 845 S.W.2d at 87; *Cornerstone Bank,* 1992 WL 86591, at *12 (affirming award of attorneys' fees because they were not payable from the foreclosure of the lien, but instead the judgment made appellants personally liable); 3 Tex. Prac. Guide Real Estate Litig. § 10:162 ("attorney's fees are not included as part of the

---

lien or to enforce a claim against a bond issued under Subchapter H, I, or J or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court **shall** [~~may~~] award costs and reasonable attorneys' fees as are equitable and just." *See* Act of September 1, 2011 82nd Leg., ch. 51, § 53.156, 2011 (S.B. 539) (emphasis/alteration added). Thus, to the extent that there was any doubt about whether a holder of a materialman's lien could recover its attorney's fees and costs in a dispute over the validity of its lien, the Texas legislature has now erased such ambiguity.

actual lien amount, but are an additional and discretionary award by the court[].”). This interpretation reconciles the seemingly inherent conflict between *Palomita* and § 53.156.

In the suit at bar, Halgo's fees are not being paid from the proceeds of any lien foreclosure. Rather, they are being paid by Amegy, pursuant to an express provision of the Plan. [Finding of Fact Nos. 14, 16 & 17]. Indeed, by virtue of this Court's granting of the Sale Motion, Halgo's materialman's lien was removed from the HPIB Facility and attached to the sale proceeds from Bigler's sale to Amegy of this Facility. [Finding of Fact No. 8]. However, because Amegy did not actually pay any cash to Bigler, but rather purchased the Facility by making a credit bid, Halgo's lien attached to the extent that if Halgo prevails in the M&M Lien Priority Adversary, then Amegy must pay cash to Halgo. [Finding of Fact No. 17]. Thus, Amegy agreed to pay the debt owed by Bigler to Halgo if Halgo prevailed in the M&M Lien Priority Adversary. [Finding of Fact No. 17]. Because Amegy agreed to assume this obligation, any proceeds paid to Halgo for its attorneys' fees are not paid from the proceeds of any lien foreclosure sale—which means that § 53.023 as construed by *Palomita* would not be violated. *See Blanco, Inc. v. Porras,* 897 F.2d 788, 793–94 (5th Cir. 1990) (initially holding that a foreclosing bank which does not assume payment of the debt secured by the mechanic's lien is not liable to the mechanic's lienholder for attorneys' fees and costs).[40] This Court therefore has the discretion to award attorneys' fees to Halgo. The Court chooses to do so because Halgo has expressly pleaded for attorneys' fees. Moreover, Halgo is substantially oversecured; and although this Court has already included that § 506(b) is inapplicable, nevertheless it is equitable and just that an oversecured creditor recover its reasonable attorneys' fees.

---

[40] Initially, the Fifth Circuit ruled that the mechanic's lienholder could not recover its attorneys' fees and costs because the bank which had foreclosed on the property had not assumed the obligation owed to the mechanic's lien holder by the debtor. *Porras,* 897 F.2d at 793-94. However, on rehearing, the Fifth Circuit reversed itself and held that the mechanic's lienholder could recover its attorneys' fees and costs from the bank because the bank never argued at the trial court that the mechanic's lienholder could not recover its fees and costs. *Id.*

2.      The Texas Civil Practice & Remedies Code also Provides a Basis for Halgo to Recover its Attorneys' Fees

Finally, even if this Court is wrong and the conflict between § 53.023 and § 53.156 cannot be reconciled, Halgo may still recovers its attorneys' fees under Texas Civil Practice and Remedies Code § 38.001, which unambiguously provides that a person may recover attorneys' fees if the claim is for furnished material.  Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2010).  Case law supports this view.  In *West v. Triple B Services*, the court, in upholding the trial court's award of attorneys' fees, expressly noted that the appellee had pleaded for attorneys' fees under both § 53.156 of the Property Code and § 38.001 of the Civil Practice and Remedies Code: "However, we need not address Classic's contention that the trial court erred in awarding the full amount of **attorney's fees** under Chapter 53, because the record supports an alternative basis for awarding the full amount of **attorney's fees** against Classic. Triple B's petition included a claim for breach of contract, and Triple B pleaded for **attorney's fees** under both **Property Code** section 53.156 and Civil Practice and Remedies **Code** section **38.001**, which allows a party to recover reasonable **attorney's fees** for a valid claim on an oral or written contract." *W. v. Triple B Servs., LLP*, 264 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2008, no pet.)

3.      To Determine the Amount of Attorneys' Fees to Award to Halgo, this Court Must Consider Several Factors

In exercising its discretionary power to award attorneys' fees, this Court must consider the following factors when determining the reasonableness of attorneys' fees and expenses, including:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (external citations omitted).

Halgo may therefore introduce evidence of reasonableness of its fees at a separate hearing, pursuant to the parties' agreement in the Pre-Trial Statement. [Adv. Docket No. 156, p. 27].

**F.      Pre-judgment Interest**

In closing arguments, Halgo's counsel conceded that Halgo is not entitled to pre-judgment interest.   [July 8, 2011 Tr. 7:18–24].  Accordingly, this Court will not award pre-judgment interest to Halgo.

**G.      Post-judgment Interest**

The Fifth Circuit has held that federal law (i.e., 28 U.S.C. § 1961) applies to an award of post-judgment interest, not Texas law.  *See Travelers Ins. Co v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993) ("The majority of the circuits have held that the federal post-judgment interest statute, 28 U.S.C. § 1961, applies to "any judgment in a civil case recovered in

a district court . . . *including actions based on diversity of citizenship*.") (quoting *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 689 (5th Cir. 1989), *cert. denied,* 493 U.S. 872 (1989) (emphasis in original) (surveying cases)).   Therefore, "federal law governs the rate of post-judgment interest on a federal court judgment even in an action otherwise governed by state law." *Lassman v. Keefe* (*In re Keefe*), 401 B.R. 520, 526 (1st Cir. 2009).   Pursuant to federal law, a trial court may award post-judgment interest "on any money judgment in a civil case." 28 U.S.C. § 1961(a) (2000).   Post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." § 1961(a).   "Interest shall be computed daily to the date of payment." § 1961(b).

A bankruptcy court proceeding is a "civil case;" hence, a judgment in a bankruptcy proceeding is subject to post-judgment interest as provided for in § 1961.   *See Ocasek v. Manville Corp. Asbestos Disease Comp. Fund*, 956 F.2d 152, 154 (7th Cir. 1992) (citing *NCNB Tex. Nat'l Bank v. A.S.M* (*In re A.S.M., Inc.*), 110 B.R. 802, 806 (Bankr. W.D. Tex. 1990) (explaining that § 1961 "applies to judgments entered by a bankruptcy court"); *Wilson v. First Nat'l Bank* (*In re Missionary Baptist Found. of Am., Inc.*), 69 B.R. 536, 539 (Bankr. N.D. Tex. 1987) (noting that because district courts have original and exclusive jurisdiction over bankruptcy cases, § 1961 applies to money judgments granted in bankruptcy court).   Thus, "[b]ecause post-judgment interest is mandated by federal statute, a prevailing party in a bankruptcy court action is automatically entitled to post-judgment interest regardless of whether post-judgment interest is referenced in the pleadings, a court's order or monetary judgment." *Lassman*, 401 B.R. at 526.

In the suit at bar, although Halgo did not specifically plead for post-judgment interest, it is entitled to it under § 1961. *See id.*; *see also Miller v. Artistic Cleaners*, 153 F.3d 781, 785 (7th Cir. 1998) ("[R]egardless of whether there is any reference to post-judgment interest in the pleadings, a court's order, or the entry of a money judgment, a prevailing plaintiff in federal court is automatically entitled to post-judgment interest."). Accordingly, Halgo is entitled to recover post-judgment interest on its claim, calculated at the Treasury yield rate defined in § 1961(a). Interest will begin accruing daily "from the date of the entry of the judgment" until the judgment is fully satisfied. § 1961(a), (b).

## VI. CONCLUSION

In closing arguments, Amegy's counsel implied that this Court should, as one factor in its decision-making process, consider the fact that Halgo did in fact receive some payment for the goods and services it provided under the Contract with Bigler [Finding of Fact No. 32]; and that, therefore, the remaining amount that Halgo is attempting to collect in this lawsuit represents a 100% profit to which the equities dictate Halgo should not receive. According to Amegy's counsel, it is inequitable for Halgo to receive its complete profit under the Contract because Amegy lent millions of dollars to Bigler and has taken a huge hit insofar as the deficiency owed by Bigler to Amegy is millions of dollars more than the aggregate amount still owed to Halgo and Shaw. [*See* July 8, 2011 Tr. 15:14–16:6].[41] In the wake of the huge loss suffered by Amegy, so the argument goes, Halgo and Shaw should not be allowed to recover any of their profit.

---

[41] There is no question that Amegy has taken a huge hit. Its claim was for approximately $68.0 million, and Bigler's assets were sold for approximately $38.0 million—thereby leaving a deficiency of approximately $30.0 million. Meanwhile, the total price of the Boiler System under the Contract between Bigler and Halgo was approximately $5.9 million [Finding of Fact No. 25]. Because Halgo is now owed $533,472.45, this means that Halgo has already been paid approximately $5.4 million. For its part, Shaw has received no monies and is owed $1,400,544.99. [Finding of Fact No. 45]. The sum of $533,472.45 plus $1,400,544.99 equals $1,934,017.44, which represents the aggregate amount presently owed to Halgo and Shaw. Needless to say, this last figure is substantially less than the approximate $30.0 million still owed to Amegy.

While the Court gives Amegy's counsel credit for zealously representing her client, whether Halgo's lien and Shaw's lien trump Amegy's liens must be determined through proper application of the extensive and specific laws of the State of Texas on mechanics' and materialmen's liens and removables, not on whether any party will wind up making a profit if that party prevails. *See Morrison v. State Trust Co.*, 274 S.W. 341, 343 (Tex. Civ. App.— Amarillo 1925, *rev'd on other grounds*, 282 S.W.214 (Tex. Comm'n App. 1926) (noting that the trial court "seems to have ignored all equitable considerations, and, applying the cold letter of the statute, gave mechanic's liens . . . precedence . . . ."). In the suit at bar, this Court has concluded that Halgo's materialman's lien on Boiler #1 and Boiler #2 is superior to Amegy's liens, but that Shaw's mechanic's lien on the piping system is not. To the extent that this conclusion generates a profit for Halgo, so be it. That is, after all, the ultimate objective of any for-profit corporation in this country's economy.

A final judgment consistent with the findings and conclusions set forth in this Memorandum Opinion will be entered on the docket after this Court holds a hearing on the amount of attorneys' fees to be awarded to Halgo.

Signed on this 19th day of August, 2011.

Jeff Bohm
United States Bankruptcy Judge